[No. S109711. July 29, 2004.]

FAREED CASSIM et al., Plaintiffs and Respondents, v.
ALLSTATE INSURANCE COMPANY, Defendant and Appellant.

## COUNSEL

Horvitz & Levy, Peter Abrahams, Nina E. Scholtz; Pollak, Vida & Fisher, Michael M. Pollak and Lawrence J. Sher for Defendant and Appellant.

Greines, Martin, Stein & Richland, Irving H. Greines, Feris M. Greenberger and Robert A. Olson for Truck Insurance Exchange, Farmers Insurance Exchange and Fire Insurance Exchange as Amici Curiae on behalf of Defendant and Appellant.

Dunn Koes, Pamela E. Dunn and Daniel J. Koes for State Farm General Insurance Company and United Services Automobile Association as Amici Curiae on behalf of Defendant and Appellant.

Law Offices of Ian Herzog, Evan D. Marshall, Ian Herzog and Amy Ardell for Plaintiffs and Respondents.

Mannion & Lowe and E. Gerard Mannion for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiffs and Respondents.

Law Office of Amy Bach and Amy Bach for United Policyholders as Amicus Curiae on behalf of Plaintiffs and Respondents.

## OPINION

**WERDEGAR, J.**—In this case involving an insurance company's bad faith, the insureds' counsel engaged in a line of reasoning during closing argument to which the insurer's counsel objected. The trial court overruled the objection, and a verdict for the insureds resulted. A divided Court of Appeal reversed the judgment, finding the closing argument was prejudicial error. We consider on review whether the insureds' counsel committed misconduct in closing argument and, if so, whether the misconduct was prejudicial. In resolving these issues, we necessarily address the proper standard of review on appeal for attorney misconduct in closing argument. In addition, we consider whether the trial court erred in awarding tort damages under *Brandt v. Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796] (*Brandt*).

We conclude that, assuming the insureds' counsel committed misconduct in closing argument, no prejudice resulted. We also conclude the trial court's decision to award damages pursuant to *Brandt* was correct, but we must remand the case to the trial court for recalculation of the proper amount.

FACTS

### A. *The Fire, the Investigation and Allstate's Bad Faith*

Plaintiffs Fareed and Rashida Cassim (the Cassims) successfully sued defendant Allstate Insurance Company (Allstate) for bad faith in the handling of their insurance claim. As the Cassims were the prevailing parties at trial, we view the evidence, which was conflicting and vigorously contested, in a light most favorable to them, resolving all conflicts in their favor. (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053 [68 Cal.Rptr.2d 758, 946 P.2d 427]; *Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660 [190 Cal.Rptr. 355, 660 P.2d 813].)

The Cassims purchased a home in Palmdale in 1989 and insured the property against loss with Allstate. In December 1990, a fire later determined to be arson caused damage to the home; although the fire burned only in the master bedroom and the kitchen, the extensive heat, smoke and water damage to the rest of the structure rendered the home uninhabitable. Deborah Birkmeyer, an Allstate representative, met the Cassims at the house, inspected the scene, photographed the damage, and gave the Cassims a check for

$10,000 as an advance on additional living expenses (ALE). Allstate assigned John Parker of Frontier Adjustors, an independent field adjuster, to the case. He began his investigation.

The Cassims initially moved to a motel in Palmdale, then to one nearer Fareed's job, where they rented two rooms for themselves and their three children. (Rashida was pregnant with a fourth child.) They later moved back to Palmdale, but after renting an unfurnished apartment, buying two mattresses, a television, bedding and towels, and making a mortgage payment on their Palmdale home, the $10,000 ALE was almost exhausted. The Cassims had been in contact with Parker, but Allstate neither offered nor paid any further ALE. Allstate made no settlement offer, although Parker had informed Allstate that his initial estimate for the value of the home's lost contents was $40,000 and for repairing the home's structural damage was $60,000.

Frustrated by the slow pace in which the matter was being resolved, the Cassims hired Anthony Thompson, a public adjuster, who determined that repairing the Cassims' home would cost $87,000. Birkmeyer rejected that estimate as inflated, and her supervisor decided to refer the matter to a law firm to have the Cassims submit to an examination under oath (EUO). At this point Allstate began to breach its duty to handle the Cassims' claim with good faith and fair dealing. Numerous instances were presented to the jury. For example, Birkmeyer stated in a declaration under oath that the Cassims' home was sparsely furnished, suggesting they were attempting to claim replacement value to which they were not entitled. She later admitted at trial her declaration was incorrect and the home was adequately furnished. Further, although Allstate's position was that the Cassims had themselves set the fire[1] and there was no sign of forced entry, one of Birkmeyer's photographs showed glass debris from a sliding glass door scattered inward into the home, indicating someone had broken in from the outside. Parker testified he never suspected the Cassims set the fire, nor did Birkmeyer or Allstate's attorneys ever suggest he investigate that possibility. Gary Fye, plaintiffs' expert, testified the fire was a "message fire" that was not intended by the arsonist to destroy the home but to instead cause great discomfort to the occupants. (Fareed Cassim is of Iranian descent; Rashida is of Indian descent.) Birkmeyer admitted at trial that, because the Cassims had so little equity in the home, they had little financial incentive to set the fire because any insurance payout would simply benefit the mortgagor.

Rashida paid cash every day for the motel rooms her family occupied after the fire. During this time, the family ate at fast-food establishments and a

---

[1] A letter from Allstate to the Cassims' attorney states their claim was denied because "[t]he fire was of incendiary origin which appears to have been the result of the actions of the insureds or on their behalf."

Persian restaurant. Rashida kept track of the day's aggregate expenses in a notebook but did not keep original receipts or other specific documentation because Birkmeyer had not instructed her to do so. When Thompson learned of this practice, he told Rashida to try obtaining replacement receipts for the family's living expenses. She then approached the restaurants and the motel but had difficulty obtaining replacement receipts. (For example, she testified the motel clerk "kind of remembered" the Cassims but refused to fill out the replacement receipt because he did not want to become involved.) Rashida filled out some replacement receipts in her own handwriting. She did not try to camouflage her handwriting and never pretended she was submitting original receipts. She testified that Thompson knew she did not have original receipts; her understanding was that he was asking her to provide reconstructed receipts. Thompson similarly testified he told Parker that Rashida had filled out the receipts to the best of her ability, trying to reconstruct the meals she had paid for. No one asked Rashida about the reconstructed receipts in any of her lengthy EUO's or depositions, nor did Allstate conduct any investigation into the legitimacy of the receipts she submitted, although it later cited her actions as evidence of fraud and misrepresentation.

Other examples of bad faith relate to how Allstate exploited its knowledge of the Cassims' perilous financial condition resulting from the exhaustion of the $10,000 ALE payment and the impending foreclosure on their home. Aware of these facts, Allstate unfairly delayed resolving the Cassims' claim, insisting that small aspects of the case justified the delay. For example, Allstate denied the Cassims' claim in part because it concluded they had been "materially false with regard to the submission of information concerning the . . . nature and extent of the property claimed," citing the Cassims' request for reimbursement for an antique set of china. Allstate asserted "there were no signs that such property existed even though the debris in the cabinet area was sifted in hopes of finding some remnants." At trial, however, Thompson testified he and Parker (Allstate's adjuster) conducted a joint walk-through of the Cassims' home, videotaping the home's interior, and they observed the broken china. (Although Allstate assured Thompson it would give him a copy of the tapes, it never did so.)

Allstate decided it would pay $35,400 for dwelling repair and refused to consider a higher amount, although many estimates were much higher. Allstate informed the Cassims that if they wanted more, they would have to follow through on their previous request for an appraisal. The Cassims, lacking the approximately $10,000 needed to pay for an appraisal and facing imminent foreclosure, eventually accepted Allstate's low estimate for the house so they could begin repairs and forestall foreclosure.

The Cassims claimed the amount of their loss for the contents of their house was $43,000; Parker (Allstate's adjuster) estimated the loss to be

$45,000; and Birkmeyer admitted these numbers did not seem "out of line." Allstate, however, originally offered the Cassims only $5,000 to replace the contents of the house, an offer it later revised to $7,000. Evidence was adduced suggesting Allstate offered a small amount that conformed to a standard target amount it used to minimize its payouts in similar cases, and that the offer did not reflect a good faith estimate of the Cassims' actual losses.

Rashida Cassim approached Birkmeyer and informed her the mortgage company was going to foreclose on her home and asked whether the claim could be resolved. Birkmeyer told Rashida she would have to fire Thompson, the public adjuster the Cassims had hired, and Birkmeyer gave Rashida instructions on how to do that. After Rashida did as she was instructed, Birkmeyer nevertheless offered no more than the $7,000 already offered and falsely told Rashida that Thompson had already accepted the check for that amount.

In the meantime, the Cassims were evicted from their apartment for nonpayment of rent and lived with relatives for a time. When repairs were finished on their home, they moved back, but subsequently lost the house to foreclosure. Allstate eventually denied their claim on the policy, asserting both that the Cassims had set fire to their own home and that they had been "materially false with regard to the submission of information concerning the cause and origin of this loss and the nature and extent of the property claimed."

The Cassims filed this suit against Allstate for breaching the implied covenant of good faith and fair dealing in connection with their insurance claim.

### B. *The Trial Court's Comments to the Jury*

At the end of the court day on Monday, October 25, 1999, the trial judge gave this admonishment to the jury: "Don't talk about the case. Don't form any opinions. And we'll reconvene then on Wednesday at 8:45 a.m., all right, for a full day, for a full day. [¶] Okay. We'll see you Wednesday. *Only those who want to get credit, come tomorrow*." (Italics added.)

■ At the end of the day on Wednesday, October 27, 1999, the trial court similarly directed the jury: "No court tomorrow. *But I'm going to allow you to come in and have credit*. And we'll pick up on Friday morning. [¶] Attorneys, I want you here at 8:30. We have a few things we have to talk about. [¶] Attorneys at 8:30. Jurors at 8:45. Don't talk about the case. Don't

form any opinions, and we'll see you Friday. *But if you come in tomorrow, you'll get credit.*" (Italics added.)[2]

### C. *The Challenged Closing Argument*

For this factually complicated case, the closing arguments of counsel comprise several hundred pages in the trial record. During the final argument, Ian Herzog, the Cassims' counsel, addressed whether Allstate had adequately shown that the Cassims had engaged in intentional misrepresentation by presenting reconstructed receipts for their alternative living expenses following the fire in their home. He said: "Now, let's talk about intentional misrepresentation for a second. I think we have a direct analogy to what goes on in this case. Let's think of this for a second if you would. Just think, you're at a job. You have worked at it real hard. You're a good employee. And then a new boss comes along. He doesn't like you. Maybe it's because of your sex, your race or whatever. And he discharges you. And he wrongfully discharges you. And you go get a lawyer and you sue for wrongful discharge.

"And your employer does what Allstate has done here is they look under every rock you were ever under. Look for every skeleton, everything in your life that they can use. And they go and they do a check and they say, oh, you were on jury duty in a case called Cassim. Okay. *And they say you were supposed to be on jury duty but there's a couple days in which there wasn't court, but you said you were on jury duty and we paid you. That's a misrepresentation.*

"[Defense Counsel Pollak]: Your Honor, I'm going to object. This is improper argument.

"Mr. Herzog: I don't think so.

---

[2] To the extent the trial court's practice enabled jurors to receive credit for jury service for days they did not actually serve, we condemn this practice in the strongest terms. Jury service is one of the obligations of citizenship; " 'by serving, the jurors are executing a primary and necessary duty as citizens.' " (*People v. Osband* (1996) 13 Cal.4th 622, 675 [55 Cal.Rptr.2d 26, 919 P.2d 640].) Although we are aware of the burden jury service can sometimes pose to jurors, their families and their employers (see Gov. Code, § 204 ["The State may require services of persons, with or without compensation: . . . in jury duty"]; Code Civ. Proc., § 215 [jurors compensated $15 per day plus mileage]; Lab. Code, § 230 [employers may not discriminate against employees serving as jurors]), such difficulties are a necessary consequence of our jury system. Allowing jurors to obtain credit for jury service on days when the court is not in session, however, threatens to undermine the jury system. Although the record reveals this unseemly practice was followed on at least two occasions in this case, the record is silent on the trial court's motivation and we will not speculate as to the court's intention. We are confident the unusual practice followed in this case was an aberration not to be repeated.

"The Court: No, overruled.

"Mr. Herzog: And they will take something, like Allstate has done here, the mortgage file or whatever, it's even worse, what they've done here and say we have grounds now to fire you because you misrepresented about you being on jury duty on certain days and you got paid when you really weren't.

"*And you say but, but, but Judge Cherness said it was okay. He says what I was doing was appropriate. And he says, no, you intentionally misrepresented. I didn't misrepresent anything. I thought that was the right thing to do.*

"She said I didn't [mis]represent anything. I was relying on Tony Thompson [the public adjuster]. I thought it was the right thing to do. I didn't intend to fool anybody.

"And your whole career, bang you're out.

"Isn't that what they've done here? *They want to put an artificial standard on what is meant by intentional misrepresentation, a standard that would apply in a courtroom setting like this that we would never apply to ourselves.* That we would not think that anything was intentional or wrong in that regard.

"But in trying to carry their burden of proof when they have this kind of flimsy . . . evidence, when they haven't done what they should have done and they're doing the lawyers' thing. *They will have you now crucify these people with an extraordinary artificial interpretation of what is intentional misrepresentation and that is not fair.*" (Italics added.)

### D. *The Jury Instructions and Special Verdicts*

Before closing argument, the trial court delivered most of the jury instructions. In particular, the court instructed the jury:

"The defendant has the burden of proving by a preponderance of the evidence all the facts necessary to establish:

"1. Plaintiffs set fire to their home.

"2. Plaintiffs made intentional material misrepresentations to defendant in the presentation of their claims.

"3. Plaintiffs breached the implied covenant of good faith and fair dealing.

"4. The breach of the implied covenant of good faith and fair dealing by the plaintiffs, was a legal cause of injury, damage, loss or harm to the plaintiffs."

As to Allstate's defense, the trial court delivered these instructions:

"Allstate has asserted a defense of intentional material misrepresentation by the plaintiffs.

"A misrepresentation is material if it concerns a subject reasonably relevant to the insurer's investigation and a reasonable insurer would attach importance to the fact misrepresented.

"Mere over-evaluation does not void a claim on a fire policy under a fraud and false swearing provision, because there must be deliberate over-statement with intent to deceive.

"An insured's over-valuing a fire loss due to mere opinion, mistake or error of judgment regarding quality, value or authenticity will not defeat an insured's recovery.

"An insured is bound by any intentional, material misrepresentation his or her agent made to the insured's insurance company whether or not the insured knew the agent made the misrepresentation.

"If you find there is contributory breach of the duty of good faith and fair dealing on the part of plaintiffs themselves which, combining with a breach of the duty of good faith and fair dealing by the defendants contributes as a legal cause in bringing about their injury, such contributory breach will result in a reduction of plaintiffs' recovery in an amount proportionate to plaintiffs' alleged bad faith. This will be calculated based upon your findings in the special verdict form."

Following closing arguments by both sides, the trial court gave its final instructions, including this one: "I've not intended by anything I've said or done or by any questions I've asked to suggest how you should decide the questions of fact, or that I believe or disbelieve any witness. *If anything I've done or said seemed to so indicate, you must disregard it and form your own opinion.*

"The purpose of the court's instructions is to instruct you in the applicable law so you may arrive at a just and lawful verdict. Whether some instructions apply will depend on what you find to be the facts. Even though I've

instructed you on various subjects, including damages, you must not treat the instructions as indicating the court's opinion on how you should decide any issue in this case as to which party is entitled to your verdict." (Italics added.)

After a 38-day trial, the jury returned a series of special verdicts, specifically finding that plaintiffs had made no intentional material misrepresentations with respect to the claim on their policy, they did not set fire to their own home, Allstate had breached the implied covenant of good faith and fair dealing, plaintiffs did not breach the covenant, and Allstate was responsible for 100 percent of the comparative bad faith. The jury awarded $1,797,300 in compensatory damages each to Fareed and Rashida Cassim. In addition, finding Allstate acted with oppression, fraud or malice, the jury also jointly awarded the Cassims $5 million in punitive damages.[3] The parties having stipulated to have the trial court sit as the trier of fact for the award, if any, of damages under *Brandt, supra,* 37 Cal.3d 813, the trial court awarded the Cassims $1,193,533 in *Brandt* fees.

In a split decision, the Court of Appeal reversed the judgment. The appellate court found Herzog's argument constituted prejudicial misconduct requiring reversal. One justice dissented, finding any misconduct was harmless. We granted review.

DISCUSSION

### A. *Waiver*

At the outset, the Cassims suggest Allstate failed to preserve its claim of attorney misconduct because, although it objected during counsel's closing argument, it did not request the jury be admonished. An admonition would have been curative in this case, they argue, because the claim of misconduct is premised on the jury's drawing improper inferences from the challenged line of argument, and a timely admonishment could have dispelled any misunderstanding.

We disagree Allstate forfeited the issue. "Generally, to preserve for appeal an instance of misconduct of counsel in the presence of the jury, an objection must have been lodged at trial." (*Miller v. Elite Ins. Co.* (1980) 100 Cal.App.3d 739, 761 [161 Cal.Rptr. 322].) In addition to objecting, a litigant faced with opposing counsel's misconduct must also "move for a mistrial or seek a curative admonition" (*Neumann v. Bishop* (1976) 59 Cal.App.3d 451, 468 [130 Cal.Rptr. 786]) unless the misconduct is so persistent that an

---

[3] Most of the verdicts were 10 to two, but the jury was unanimous in finding that the Cassims did not set fire to their home.

admonition would be inadequate to cure the resulting prejudice (*id.* at p. 469). This is so because "[o]ne of the primary purposes of admonition at the beginning of an improper course of argument is to avoid repetition of the remarks and thus obviate the necessity of a new trial." (*Sabella v. Southern Pac. Co.* (1969) 70 Cal.2d 311, 320 [74 Cal.Rptr. 534, 449 P.2d 750].) The rule is the same for civil and criminal cases. (See *People v. Noguera* (1992) 4 Cal.4th 599, 638 [15 Cal.Rptr.2d 400, 842 P.2d 1160].) However, "the absence of a request for a curative admonition does not forfeit the issue for appeal if 'the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request.' " (*People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

The latter rule applies in this case. Herzog, the Cassims' counsel, raised in his closing argument the subject of the trial court's direction that jurors sign in on days when court was not in session. Pollak, Allstate's counsel, objected immediately, but the trial court summarily overruled his objection, giving him no opportunity to request a curative admonition. Herzog then continued with this challenged line of argument. As in the case of *People v. Hall* (2000) 82 Cal.App.4th 813 [98 Cal.Rptr.2d 527], plaintiffs "[do] not explain how the court might have been persuaded to give a curative admonition since it found the objection meritless." (*Id.* at p. 817.) Under the circumstances, we find defendant Allstate had no opportunity to request the jury be admonished, and its timely objection was thus sufficient to preserve the issue for our review.

### B. *Attorney Misconduct in Closing Argument*

When presentation of the evidence is concluded in a civil trial, "unless the case is submitted to the jury on either side or on both sides without argument, the plaintiff must commence and may conclude the argument." (Code Civ. Proc., § 607, par. 7.) In conducting closing argument, attorneys for both sides have wide latitude to discuss the case. " ' " 'The right of counsel to discuss the merits of a case, both as to the law and facts, is very wide, and he has the right to state fully his views as to what the evidence shows, and as to the conclusions to be fairly drawn therefrom. The adverse party cannot complain if the reasoning be faulty and the deductions illogical, as such matters are ultimately for the consideration of the jury.' " ' [Citations.] 'Counsel may vigorously argue his case and is not limited to "Chesterfieldian politeness." ' [Citations.] 'An attorney is permitted to argue all reasonable inferences from the evidence, . . .' [Citation.] 'Only the most persuasive reasons justify handcuffing attorneys in the exercise of their advocacy within the bounds of propriety.' [Citation.]" (*Grimshaw v. Ford*

*Motor Co.* (1981) 119 Cal.App.3d 757, 798–799 [174 Cal.Rptr. 348].) The same rules apply in a criminal case. (See *People v. Hill, supra,* 17 Cal.4th at p. 819.)

■ An attorney who exceeds this wide latitude commits misconduct. For example, "[w]hile a counsel in summing up may indulge in all fair arguments in favor of his client's case, he may not assume facts not in evidence or invite the jury to speculate as to unsupported inferences." (*Malkasian v. Irwin* (1964) 61 Cal.2d 738, 747 [40 Cal.Rptr. 78, 394 P.2d 822].) Nor may counsel properly make personally insulting or derogatory remarks directed at opposing counsel or impugn counsel's motives or character. (*Garden Grove School Dist. v. Hendler* (1965) 63 Cal.2d 141, 143 [45 Cal.Rptr. 313, 403 P.2d 721].) Additional examples abound; these are but a few. (See 7 Witkin, Cal. Procedure (4th ed. 1997) Trial, § 227, p. 260 et seq.)

Allstate contends Herzog's reference to the trial court's permitting jurors to claim unearned service credit constituted misconduct in two respects. First, Allstate claims counsel's argument was an improper appeal to the jurors' self-interest. Second, Allstate claims counsel suggested the manner in which the Cassims documented their alleged fire losses and postfire living expenses had judicial approval.

### 1. *Appealing to the jury's self-interest*

■ An attorney's appeal in closing argument to the jurors' self-interest is improper and thus is misconduct because such arguments tend to undermine the jury's impartiality. (*People v. Pitts* (1990) 223 Cal.App.3d 606, 696 [273 Cal.Rptr. 757] ["it is improper to appeal to the self-interest of jurors or to urge them to view the case from a personal point of view"].) For example, in *Du Jardin v. City of Oxnard* (1995) 38 Cal.App.4th 174 [45 Cal.Rptr.2d 48], the city delivered a dumpster to the local school district. The dumpster had a dangerous hole in the floor, which district employees saw but did not fix. The plaintiff, a maintenance worker for the district, sued the city after he was injured when he accidentally stepped into the hole. In closing argument, the city's attorney argued that " '[w]hen a public agency, be it a school or a library or a hospital is held liable for the admittedly negligent conduct of other people [presumably referring to the school district's employees], we just have to sit back and start counting the public services that will disappear when we hold a public entity liable for the negligence of other persons.' " (*Id.* at p. 177.) The Court of Appeal held this argument was misconduct: "Counsel had appealed directly to the jurors' personal passions and prejudices. This is not a situation where remarks were focused on some corporate entity or on a litigant. Instead, these salvos struck at the heart of the jurors' pocketbooks." (*Id.* at p. 179.)

Similarly, in *People ex rel. Dept. of Public Works v. Graziadio* (1964) 231 Cal.App.2d 525 [42 Cal.Rptr. 29] (*Graziadio*), a case involving eminent domain, the Court of Appeal found an attorney committed misconduct when he suggested in closing argument that the jury should view the question of just compensation from the "personal point of view as a taxpayer." (*Id.* at p. 533.) The appellate court held such argument was improper because it "appeal[ed] to [the jurors'] self-interest, which violates the fundamental concept of an objective trial by an impartial jury." (*Id.* at p. 534.)

Contrary to Allstate's contentions, Herzog's argument did not appeal to the jurors' personal self-interest. Unlike in the cases cited above, nothing in the challenged argument suggested the jurors were themselves personally or financially at risk if they returned a verdict in Allstate's favor. The argument implied neither that a verdict for Allstate would somehow invalidate the trial court's direction that jurors could sign in for service on days when no court session was scheduled nor that a judgment for Allstate would render the jurors personally liable for defrauding their employers were they to do as the court had suggested. This case is thus distinguishable from *Du Jardin v. City of Oxnard, supra,* 38 Cal.App.4th 174, where the argument in question suggested a verdict for the city would result in reduced public services for all (including the jurors), and from *Graziadio, supra,* 231 Cal.App.2d 525, where the argument suggested the jury should not be overly generous in awarding compensation because the money ultimately would come from taxpayers such as themselves.

The Court of Appeal below did not directly address the concern of juror self-interest, but instead construed Allstate's contention to be that Herzog's argument was an impermissible variant of the so-called golden rule argument, in which counsel asks jurors to put themselves in the plaintiff's shoes and ask what compensation they would personally expect. (See *Beagle v. Vasold* (1966) 65 Cal.2d 166, 182, fn. 11 [53 Cal.Rptr. 129, 417 P.2d 673]; *Loth v. Truck-A-Way Corp.* (1998) 60 Cal.App.4th 757, 765 [70 Cal.Rptr.2d 571].)[4] The Court of Appeal found that, by his argument, plaintiff's counsel "placed at least some of the jurors in the shoes of the Cassims when he thinly intimated they [the jurors] had committed a fraud by not going to work while collecting pay on days when the court was not in session. Counsel knowingly exploited the fact that many employers would have refused to pay for jury

---

[4] "The jury must impartially determine pain and suffering damages based upon evidence specific to the plaintiff, as opposed to statistical data concerning the public at large. The only person whose pain and suffering is relevant in calculating a general damage award is the plaintiff. How others would feel if placed in the plaintiff's position is irrelevant. It is improper, for example, for an attorney to ask jurors how much 'they would "charge" to undergo equivalent pain and suffering.' [Citation.] 'This so-called "golden rule" argument [citation] is impermissible.' " (*Loth v. Truck-A-Way Corp., supra,* 60 Cal.App.4th at pp. 764–765, fn. omitted.)

service on those days when the jury was not in session even though the jurors had 'been given credit' for appearing. Therefore, when the jurors retired to deliberate, they were conscious of the fact that whatever else the Cassims had done, it was no worse than what the jurors, with the court's approval, had done."

The appellate court thus found Herzog had improperly suggested that if the Cassims had intentionally misrepresented their living expenses, the jurors who had signed in for jury service when court was not in session had engaged in similar misrepresentation. The evil of such argument is that it risks converting the jurors from impartial decision makers into personal partisans. As one appellate court explained: "The appeal to a juror to exercise his subjective judgment rather than an impartial judgment predicated on the evidence cannot be condoned. It tends to denigrate the jurors' oath to well and truly try the issue and render a true verdict according to the evidence. (Code Civ. Proc., § 604.) Moreover, it in effect asks each juror to become a personal partisan advocate for the injured party, rather than an unbiased and unprejudiced weigher of the evidence." (*Neumann v. Bishop, supra,* 59 Cal.App.3d at pp. 484–485.)

Although Herzog's argument, perhaps ill advisedly, asked the jurors to consider their personal experience in the courtroom in reaching their verdict, the argument could not have converted them into "partisan advocate[s]" for the Cassims. The clear point of the argument was that people do not commit the type of "intentional misrepresentation" that would void an insurance policy if they misrepresent something at the direction of someone in authority (presumably, in this case, invoking plaintiffs' reliance on Thompson's advice that they reconstruct living expense receipts as best they could). Herzog never urged the jurors to put themselves in the Cassims' position or to view the case from the Cassims' personal perspective. We thus find the disputed argument was not improper for either appealing to the jurors' self-interest or urging them to decide the case subjectively rather than objectively.

## 2. *Suggesting judicial approval*

The Court of Appeal found Herzog's argument was misconduct for a second reason. Relying on *Sanguinetti v. Moore Dry Dock Co.* (1951) 36 Cal.2d 812 [228 P.2d 557] (*Sanguinetti*), the appellate court concluded Herzog had committed misconduct by arguing the Cassims' asserted misrepresentations in their claims of losses and living expenses were equivalent to the misrepresentations the trial court condoned when it authorized jurors to claim credit for days when no court sessions took place. As the Court of Appeal majority reasoned: "Here, in a case where fraud in an insurance claim

was a primary issue in the case, counsel for plaintiff[s] went right to the fact that the jurors had been essentially cheating their employers. When counsel made reference to the fact that some of the jurors might be accused of cheating[,] there was no question he was letting the jurors know that the court had no objections to the procedure. When the objection was [not] sustained there was nothing else [defense] counsel could do except object again which would have had the effect of drumming home to the jury that the court thought a little cheating was permissible." (Fn. omitted.)

As the appellate court recognized, *Sanguinetti, supra*, 36 Cal.2d 812, provides a useful precedent. In that case, the plaintiff sued to recover for injuries he suffered while working on the defendant's tugboat. At the close of the plaintiff's case, his attorney moved in the presence of the jury to increase the prayer for damages from $50,000 to $75,000. After argument by the parties outside the jury's presence, the trial court granted the motion. The defendant then moved for a mistrial, claiming the plaintiff's counsel had committed misconduct by moving to increase the damages in front of the jury. The trial court denied the motion. After both sides rested, the trial court instructed the jury that damages could not be in excess of $75,000. The jury returned a verdict for the plaintiff in the amount of $75,000. (*Id.* at pp. 815–816.)

This court reversed and remanded for a new trial. While admitting that no direct California authority prohibited the practice, we held that moving before the jury, after the production of evidence, to increase the prayer for damages "should be unhesitantly condemned and stricken down." (*Sanguinetti, supra*, 36 Cal.2d at p. 819.) We explained that if the trial court grants such a motion, the implied message is that the trial court believes the increased damages are warranted by the evidence. Because the trial court's views would necessarily have undue weight with the jury, implying the trial court approves of some portion of a litigant's case is improper. (Cf. *People v. Carpenter* (1997) 15 Cal.4th 312, 353 [63 Cal.Rptr.2d 1, 935 P.2d 708] [trial court commits misconduct if, by its remarks, it "create[s] the impression it is allying itself with the prosecution"].)

The Court of Appeal in *Neumann v. Bishop, supra*, 59 Cal.App.3d 451, cited *Sanguinetti, supra*, 36 Cal.2d 812, with approval. In closing argument in *Neumann*, the plaintiff's attorney suggested the superior court would not have accepted his lawsuit for filing unless the amount of damages prayed for had qualified for the monetary jurisdiction of the court. (*Neumann, supra*, at p. 486.) In addition, counsel implied that the trial court had approved or endorsed the testimony of his expert witnesses; in fact, the court had simply approved his right to present such experts. (*Ibid.*) The appellate court found the plaintiff's counsel had committed misconduct in his argument because "it

is improper and misconduct for counsel to argue that his case or some aspect thereof has judicial approval." (*Id.* at p. 485.) The court then found any misconduct was harmless on the facts of the case.

The reasoning of *Sanguinetti, supra,* 36 Cal.2d 812, and *Neumann v. Bishop, supra,* 59 Cal.App.3d 451, suggests plaintiffs' counsel may have ventured into improper argument by implying the trial court had endorsed the Cassims' alleged misrepresentation in presenting Allstate with reconstructed and allegedly inflated receipts for their living expenses. Such endorsement could be inferred, Herzog arguably implied, because any misrepresentation by the Cassims was analogous to the court-approved practice of jurors falsely signing in for jury service. However, we need not decide whether Herzog improperly suggested his clients' actions had judicial approval because, as we explain below, even if he did commit misconduct,[5] it was harmless.

### C. *Prejudice*

Our state Constitution provides that "[n]o judgment shall be set aside, or new trial granted, in any cause, . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) "The effect of this provision is to eliminate any presumption of injury from error, and to require that the appellate court examine the evidence to determine whether the error did in fact prejudice the defendant. Thus, reversible error is a relative concept, and whether a slight or gross error is ground for reversal depends on the circumstances in each case." (6 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Reversible Error, § 1, p. 443.)

The phrase "miscarriage of justice" has a settled meaning in our law, having been explained in the seminal case of *People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243] (*Watson*). Thus, "a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Id.* at p. 836.) "We have made clear that a 'probability' in this context does not mean more likely than not, but merely a *reasonable chance,* more than an *abstract possibility.*" (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715 [34 Cal.Rptr.2d 898, 882 P.2d 894].)

---

[5] By referring to Herzog's actions as "misconduct," we simply employ the term commonly used to describe this type of error. We do not mean to imply he acted intentionally or with a "culpable state of mind." (*People v. Hill, supra,* 17 Cal.4th at p. 823, fn. 1.)

In contrast to errors having a basis in the federal Constitution,[6] the so-called *Watson* standard applies generally to all manner of trial errors occurring under California law, precluding reversal unless the error resulted in a miscarriage of justice. (See generally *People v. Cahill* (1993) 5 Cal.4th 478, 493–494 [20 Cal.Rptr.2d 582, 853 P.2d 1037].) Criminal law practitioners are no doubt well familiar with the *Watson* standard, as it has been cited often in finding state law violations did not require reversal of criminal judgments. (See, e.g., *People v. Kraft* (2000) 23 Cal.4th 978, 1066 [99 Cal.Rptr.2d 1, 5 P.3d 68] [refusal of requested instruction]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1211 [56 Cal.Rptr.2d 49, 920 P.2d 1254] [violation of statutory right to be present at trial]; *People v. Reed* (1996) 13 Cal.4th 217, 230–231 [52 Cal.Rptr.2d 106, 914 P.2d 184] [erroneous admission of hearsay evidence].)

Conversely, we also have cited the *Watson* standard in finding that state law error required reversal of the judgment and a new trial. (See, e.g., *People v. Ortiz* (1978) 22 Cal.3d 38, 48 [148 Cal.Rptr. 588, 583 P.2d 113] [denial of severance]; *People v. Dewberry* (1959) 51 Cal.2d 548, 557–558 [334 P.2d 852] [failure to instruct jury that if a reasonable doubt exists between a greater and lesser offense, a verdict for the lesser is required].) Misconduct in closing argument can, depending on the circumstances, require reversal of a criminal judgment. (*People v. Herring* (1993) 20 Cal.App.4th 1066, 1073–1077 [25 Cal.Rptr.2d 213] [unsupported reference to defendant's character and personal attack on integrity of defense counsel]; see also *People v. Hill, supra,* 17 Cal.4th at pp. 823–844 [reversal for pervasive prosecutorial misconduct, including misconduct during closing argument].)

■ Although the *Watson* standard is most frequently applied in criminal cases, it applies in civil cases as well. For example, we cited *Watson, supra,* 46 Cal.2d 818, with approval in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548 [34 Cal.Rptr.2d 607, 882 P.2d 298], where we explained that article VI, section 13 of the state Constitution applied in civil cases. "No form of civil trial error justifies reversal and retrial, with its attendant expense and possible loss of witnesses, where in light of the entire record, there was no actual prejudice to the appealing party." (*Soule, supra,* at p. 580.) Accordingly, errors in civil trials require that we examine "each individual case to determine whether prejudice actually occurred in light of the entire

---

[6] Violations of the United States Constitution are tested by a different standard. "An error that violates a defendant's rights under the federal Constitution requires automatic reversal if it constitutes a 'structural defect' in the trial. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 310 [113 L.Ed.2d 302, 111 S.Ct. 1246, 1265].) On the other hand, if it represents 'simply an error in the trial process' (*ibid.*), it is subject to harmless error analysis under the standard the high court announced in *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]." (*People v. Epps* (2001) 25 Cal.4th 19, 29 [104 Cal.Rptr.2d 572, 18 P.3d 2].)

record." (*Ibid.*; see also *Richards v. Owens-Illinois, Inc.* (1997) 14 Cal.4th 985, 1004 [60 Cal.Rptr.2d 103, 928 P.2d 1181] [directing lower court, on remand, to apply *Watson* standard]; *In re Marriage of Carney* (1979) 24 Cal.3d 725, 729–730, fn. 3 [157 Cal.Rptr. 383, 598 P.2d 36] [erroneous exclusion of evidence held not prejudicial under *Watson* standard]; *County of Los Angeles v. Nobel Ins. Co.* (2000) 84 Cal.App.4th 939, 944–945 [101 Cal.Rptr.2d 320] [same, re denial of motion to set aside forfeiture]; *Beasley v. Wells Fargo Bank* (1991) 235 Cal.App.3d 1383, 1397 [1 Cal.Rptr.2d 446] [same re error in submitting legal question to jury].) The *Watson* standard is essentially congruent with the longtime statutory standard for reversal set forth in Code of Civil Procedure section 475, which provides in pertinent part that "[n]o judgment . . . shall be reversed or affected by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect *was prejudicial*, and also that by reason of such error, ruling, instruction, or defect, the said party complaining or appealing sustained and suffered substantial injury, *and that a different result would have been probable* if such error, ruling, instruction, or defect had not occurred or existed. There shall be no presumption that error is prejudicial, or that injury was done if error is shown." (Italics added.)

■ As in criminal cases, misconduct by counsel in closing argument in civil cases can constitute prejudicial error entitling the aggrieved party to reversal of the judgment and a new trial. "It is . . . well settled that misconduct [by counsel] has often taken the form of improper argument to the jury, such as by urging facts not justified by the record or suggesting that the jury may resort to speculation (*Malkasian v. Irwin, supra*, 61 Cal.2d 738, 747); by informing the jury that an injured party has been compensated by a codefendant (*Tobler v. Chapman* (1973) 31 Cal.App.3d 568, 575 [107 Cal.Rptr. 614]); and by informing the jury of an offer of settlement and compromise (*Granville v. Parsons* (1968) 259 Cal.App.2d 298, 304 [66 Cal.Rptr. 149])." (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 870 [135 Cal.Rptr. 647, 558 P.2d 545].)

Accordingly, we must determine whether it is reasonably probable Allstate would have achieved a more favorable result in the absence of that portion of Herzog's closing argument now challenged. Examining the entire case, including the evidence adduced, the instructions delivered to the jury, and the entirety of Herzog's argument, we conclude any suggestion on his part that the trial court approved of his construction of the term "intentional misrepresentation," even if misconduct, was harmless. To begin with, the offending argument was fleeting, comprising just two sentences in the reporter's

transcript of a closing argument that covers more than 150 pages.[7] Any suggestion of judicial approval was thus a mere fraction of counsel's overall closing argument and a miniscule part of the entire 10-week trial. (See *People v. Pensinger* (1991) 52 Cal.3d 1210, 1250 [278 Cal.Rptr. 640, 805 P.2d 899] [improper comment held harmless error because it was "isolated" and "not repeated"].)

It is true, as the Court of Appeal majority observed, that "there is no inherent requirement that the misconduct be of a continuous nature" and that a single instance of misconduct can justify reversal. For example, in *Hoffman v. Brandt* (1966) 65 Cal.2d 549 [55 Cal.Rptr. 417, 421 P.2d 425], this court reversed the judgment for essentially a single comment, made before the jury, that a verdict for the plaintiff would force the defendant, an elderly man, into a home for the indigent. Certainly the improper revelation of strongly prejudicial information from outside the record, such as the defendant having compromised with a third party to an accident (*Brown v. Pacific Electric Ry. Co.* (1947) 79 Cal.App.2d 613 [180 P.2d 424]), or the defendant being insured (*Swift v. Winkler* (1957) 148 Cal.App.2d 927 [307 P.2d 666]), can, under some circumstances, alone require reversal. Nevertheless, that a single instance of attorney misconduct during closing argument could, standing alone, theoretically justify reversal does not mean Herzog's arguments rose to this level. As noted, his reference to the trial court's approval of the jury sign-in procedure was brief. Nor did he directly or explicitly ask the jury to draw the conclusion of judicial approval, leaving the linkage merely implied. Such indirect comments, even if improper, are generally found harmless. (Cf. *People v. Boyette* (2002) 29 Cal.4th 381, 455–456 [127 Cal.Rptr.2d 544, 58 P.3d 391] [" ' "[I]ndirect, brief and mild references to a defendant's failure to testify, without any suggestion that an inference of guilt be drawn therefrom, are uniformly held to constitute harmless error" ' "]; accord, *People v. Bradford* (1997) 15 Cal.4th 1229, 1340 [65 Cal.Rptr.2d 145, 939 P.2d 259].) Such misconduct is far from the type of bombshell revelation that could, standing alone, require reversal.

In addition to the brevity and obliqueness of the challenged comments, we also consider the ameliorating effect of the trial court's instructions to the jury to guide its decisionmaking. Absent some contrary indication in the record, we presume the jury follows its instructions (*NBC Subsidiary (KNBC-TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1223 [86 Cal.Rptr.2d 778, 980 P.2d 337]; *People v. Hardy* (1992) 2 Cal.4th 86, 208 [5 Cal.Rptr.2d 796, 825 P.2d 781]) "and that its verdict reflects the legal

---

[7] The entirety of counsel's argument specifically invoking the judge's implied approval is as follows: "And you say but, but, but Judge Cherness said it was okay. He says what I was doing was appropriate. And he says, no, you intentionally misrepresented. I didn't misrepresent anything. I thought that was the right thing to do."

limitations 'those instructions imposed" (*Saari v. Jongordon Corp.* (1992) 5 Cal.App.4th 797, 808 [7 Cal.Rptr.2d 82]). As noted, *ante*, the trial court specifically instructed the jury that "[m]ere over-evaluation" of financial losses does not constitute intentional misrepresentation "because there must be deliberate over-statement *with intent to deceive.*" The court further instructed the jury that an over-valuing of a fire loss "due to mere opinion, mistake or error of judgment regarding . . . value . . . will not defeat an insured's recovery." These instructions were responsive to the point Herzog presumably was trying to address in the argument now challenged, namely, that the Cassims did not intentionally misrepresent their living expenses because, even if they did overstate the expenses, they did so not with the intent to deceive Allstate, but merely in an effort to comply with the direction of Thompson, the public adjuster, that they reconstruct their expenses as best they could.

▆▆▆ Of further significance is that the trial court instructed the jury not to take its cue from anything the trial court may have suggested or implied. (See BAJI Nos. 15.20, 15.21.)[8] From this instruction, we can infer that although Herzog suggested to the jury that the trial court condoned the Cassims' actions, the jury would have declined the suggestion and instead focused on the evidence. An analogous situation was presented in *Gist v. French* (1955) 136 Cal.App.2d 247 [288 P.2d 1003].[9] In that case, involving a claim of medical malpractice, the defendant physician's attorney questioned the plaintiff's medical expert witness, focusing on the fact he was from outside the

---

[8] BAJI No. 15.21 states: "I have not intended by anything I have said or done, or by any questions that I have asked, to suggest how you should decide any questions of fact submitted to you.

"If anything I have done or said has seemed to so indicate, you must disregard it and form your own opinion.

"At this time, however, and for the purpose of assisting you in properly deciding this case, I am permitted by the Constitution of California to comment on the evidence and the testimony and believability of any witness.

"My comments are intended to be advisory only and are not binding on you as you must be the exclusive judges of the questions of fact submitted to you and of the believability of the witnesses.

"You may disregard any or all of my comments if they do not coincide with your views of the evidence and the believability of the witnesses."

BAJI No. 15.20 is similar: "I have not intended by anything I have said or done, by any questions that I have asked, or by any rulings that I have made, to suggest how you should decide any questions of fact, or that I believe or disbelieve any witness.

"If anything I have done or said has seemed so to indicate, you must disregard it and form your own opinion."

[9] *Gist v. French, supra*, 136 Cal.App.2d 247, was disapproved on other grounds in *Deshotel v. Atchison, T. & S. F. Ry. Co.* (1958) 50 Cal.2d 664, 667 [328 P.2d 449], and *West v. City of San Diego* (1960) 54 Cal.2d 469, 478 [6 Cal.Rptr. 289, 353 P.2d 929], which were in turn overruled by *Rodriguez v. Bethlehem Steel Corp.* (1974) 12 Cal.3d 382 [115 Cal.Rptr. 765, 525 P.2d 669].

local area. The trial court then commented before the jury that convincing local physicians to testify to the negligence of other local doctors was difficult. On appeal, the defendant physician argued such comment was prejudicial error. The appellate court explained that "[t]he court's remark carried no evil implications" (*id.* at p. 258), but that "[c]onceding, arguendo, the vice of the court's language, as contended by appellant, it is deemed to have been swept away by the instruction that if 'I have said or done anything which has suggested to you that I am inclined to favor the claims or position of either party, you will not suffer yourselves to be influenced by any such suggestion' " (*ibid.*).

In like fashion, to the extent Herzog's argument encouraged the jury to view the trial court's approval of the jury sign-in procedure as somehow indicating its approval of the Cassims' actions, the court's delivery of BAJI No. 15.21 would have dispelled any improper inference. (See *People v. Proctor* (1992) 4 Cal.4th 499, 543 [15 Cal.Rptr.2d 340, 842 P.2d 1100] [BAJI No. 15.21]; *Neumann v. Bishop, supra,* 59 Cal.App.3d at p. 486 [BAJI No. 15.20].)

Considering the brevity and indirect nature of the challenged argument, together with the court's jury instructions (a) explaining the meaning of an "intentional misrepresentation" and (b) cautioning the jury not to take its cue from the trial court's actions or comments, we conclude Herzog's argument referring to the trial court's direction, even if misconduct, did not result in a miscarriage of justice under article VI, section 13 of the California Constitution because it is not reasonably probable Allstate would have obtained a more favorable verdict in the absence of the argument. Any error was thus harmless.

### D. *Attorney Fees Under Brandt v. Superior Court*

The jury awarded the Cassims a combined $3,594,600 in compensatory damages and $5 million in punitive damages. Before the verdict, the parties stipulated that the trial court, sitting as a trier of fact, would separately decide the issue of *Brandt* fees, that is, the amount of attorney fees payable as damages. (*Brandt, supra,* 37 Cal.3d 813.) Thereafter the trial court, without explanation, awarded plaintiffs $1,193,533 in *Brandt* fees. Allstate contends the trial court erred by calculating the *Brandt* fees as a percentage of the entire compensatory damage award, rather than as a percentage of only that portion of the award that represented lost benefits on the insurance policy. We conclude Allstate is incorrect, but because the trial court's decision is not supported by substantial evidence, it abused its discretion in awarding as much in *Brandt* fees as it did.

■ California adheres to the American rule, "which provides that each party to a lawsuit must ordinarily pay his own attorney fees." (*Trope v. Katz* (1995) 11 Cal.4th 274, 278 [45 Cal.Rptr.2d 241, 902 P.2d 259].) The rule has been codified in Code of Civil Procedure section 1021: "Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties . . . ." (See also *id.*, § 1033.5, subd. (a)(10) ["The following items are allowable as costs under Section 1032: [¶] . . . [¶] (10) Attorney fees, when authorized by any of the following: [¶] (A) Contract. [¶] (B) Statute. [¶] (C) Law"].)

■ In *Brandt*, this court established a notable exception to this rule for insurance bad faith cases. We explained that if an insurer fails to act fairly and in good faith when discharging its responsibilities concerning an insurance contract, such breach may result in tort liability for proximately caused damages. Those damages can include the insured's cost to hire an attorney to vindicate the insured's legal rights under the insurance policy. "When an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for that expense. The attorney's fees are an economic loss—damages—proximately caused by the tort. [Citation.] These fees must be distinguished from recovery of attorney's fees *qua* attorney's fees, such as those attributable to the bringing of the bad faith action itself. What we consider here is attorney's fees that are recoverable as damages resulting from a tort in the same way that medical fees would be part of the damages in a personal injury action." (*Brandt, supra*, 37 Cal.3d at p. 817.)

■ *Brandt* distinguished the limitation set forth in Code of Civil Procedure section 1021, reasoning that recovery of attorney fees as damages flowing from an insurer's breach of the implied covenant of good faith and fair dealing was different from the award of attorney fees as fees. (*Brandt, supra*, 37 Cal.3d at pp. 817–818.) We noted our holding was consistent with the rule permitting recovery of attorney fees as damages in cases of false arrest and malicious prosecution. (*Id.* at p. 818, citing *Nelson v. Kellogg* (1912) 162 Cal. 621 [123 P. 1115] and *Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 59 [118 Cal.Rptr. 184, 529 P.2d 608].) The rule permitting recovery of attorney fees as damages in insurance bad faith cases is now well settled.[10]

---

[10] *White v. Western Title Ins. Co.* (1985) 40 Cal.3d 870, 890 [221 Cal.Rptr. 509, 710 P.2d 309]; *Track Mortgage Group, Inc. v. Crusader Ins. Co.* (2002) 98 Cal.App.4th 857, 867 [120 Cal.Rptr.2d 228]; *Campbell v. Cal-Gard Surety Services, Inc.* (1998) 62 Cal.App.4th 563, 571–572 [73 Cal.Rptr.2d 64]; 7 Witkin, California Procedure, *supra*, Judgment, section 149, pages 665–669; Croskey et al., California Practice Guide: Insurance Litigation (The Rutter Group 2003) paragraph 13:120, page 13-25; *id.*, paragraphs 13:126 to 13:129, pages 13–27 to

Because, however, entitlement to attorney fees as compensatory damages is premised on an insured's need to hire an attorney to vindicate his or her contractual rights under an insurance policy, we placed a critical limitation on the amount of fees recoverable. "The fees recoverable, however, *may not exceed the amount attributable to the attorney's efforts to obtain the rejected payment due on the insurance contract. Fees attributable to obtaining any portion of the plaintiff's award which exceeds the amount due under the policy are not recoverable.*" (*Brandt, supra,* 37 Cal.3d at p. 819, italics added.) As if to underscore this point, we immediately thereafter explained that the calculation of fees was best done by the trial court sitting as trier of fact, after the jury had reached its verdict. (*Id.* at pp. 819–820.) If the issue is submitted to the jury, however, "the court should instruct along the following lines: 'If you find (1) that the plaintiff is entitled to recover on his cause of action for breach of the implied covenant of good faith and fair dealing, and (2) that because of such breach it was reasonably necessary for the plaintiff to employ the services of an attorney to collect the benefits due under the policy, then and only then is the plaintiff entitled to an award for attorney's fees incurred to obtain the policy benefits, *which award must not include attorney's fees incurred to recover any other portion of the verdict.*' " (*Id.* at p. 820, italics added.)

The Cassims agreed to pay their attorney a 40 percent contingency fee, that is, 40 percent of all sums recovered. Nothing in the contingent fee agreement differentiated between recovery on the contract and recovery on the tort, or between compensatory damages and punitive damages. The amount due on their insurance policy apparently was $40,856.40.[11] According to Allstate, the *Brandt* fees therefore should have been 40 percent of $40,856.40, or $16,342.56. By contrast, plaintiffs argue the *Brandt* fees awarded by the trial court were correct. As they argued to the trial court, "[a]ll of the causes of action and all of the defenses were inextricably bound in the litigation as Allstate has always taken the position that the policy was void because of its allegations that the Plaintiffs had committed arson and fraud. These defenses, if established, would defeat any obligation to pay on the insurance policy and the Plaintiffs would never have received any policy benefits at all." Plaintiffs'

---

13-28; 2 California Insurance Law & Practice (LexisNexis 2004) section 13.03[5][c], page 13-35 & fn. 109; but see *Burnaby v. Standard Fire Ins. Co.* (1995) 40 Cal.App.4th 787, 797 [47 Cal.Rptr.2d 326] (suggesting this court overrule *Brandt*).

[11] The exact amount is unclear. Plaintiffs submitted a sworn statement in proof of loss to Allstate claiming the replacement cost value of the contents of their home was $44,208.00 and the actual cost value was $43,521.40. Allstate's attorney, Michael Pollak, however, explained that an arithmetical error had occurred on the proof of loss, and that the true amount claimed should have been $40,856.40, the amount Allstate used when opposing the Cassims' motion in the trial court for attorney fees.

counsel did not attempt to apportion fees between the contract and tort causes of action, declaring in their motion that, "[a]s is customary with contingency fee attorneys, counsel did not keep contemporaneous time records."

*Brandt, supra,* 37 Cal.3d 813, does not disclose whether the plaintiff in that case had a contingent or an hourly fee arrangement and thus provides no express direction on how to calculate *Brandt* fees in a contingent fee case. Nevertheless, we reject both proffered methods of calculation. Although Allstate argues that *Brandt* fees should be limited to 40 percent of the recovery on the contract, that method of calculation is flawed. First, it is premised on the assumption that when plaintiffs agreed to pay a 40 percent contingent fee, they were agreeing to pay separately 40 percent of the contract recovery and 40 percent of the tort recovery. From this unstated and unsupported premise, Allstate reasons that plaintiffs paid their attorney only $16,342.56 (40 percent of $40,856.40) to recover on the contract. More accurate, however, is to say that plaintiffs agreed, as is generally the case, to pay their attorney an unallocated and undifferentiated 40 percent of their total recovery, whatever that might be. To conclude that to obtain a $40,856.40 contract recovery plaintiffs are out of pocket precisely $16,342.56, no more and no less, is therefore a fiction.

To be sure, had the jury failed to return a verdict on any of the tort causes of action, plaintiffs would have been out of pocket exactly 40 percent of the contract recovery.[12] (Of course, without a tort judgment, there could be no *Brandt* fees.) But here the jury found Allstate's actions tortious and awarded plaintiffs both contract and tort compensatory damages. Plaintiffs, in turn, were obligated to pay a percentage of the total compensatory damages judgment as an attorney fee. If plaintiffs can prove that some portion of that fee was for legal work solely or partially attributable to the contract, failure to reimburse plaintiffs for that out-of-pocket expense would necessarily result in a diminution of their policy benefits.

---

[12] Alternatively, had the contract and tort causes of action been tried separately, one after the other, plaintiffs would have owed their attorney only 40 percent of the contract recovery as the legal fee for the contract-based lawsuit. Such an outcome is hypothetical only, however, for separate lawsuits in this circumstance would be impermissible, violating the rule against splitting causes of action. (See *Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 897 [123 Cal.Rptr.2d 432, 51 P.3d 297].) *Brandt* itself considered the conceptual model of separate lawsuits to illustrate a point, saying that "[i]f the insured were to recover benefits under the policy in a separate action before suing on the tort, the distinction between fees incurred in the policy action, recoverable as damages, and those incurred in the tort action, nonrecoverable, would be unmistakable." (*Brandt, supra,* 37 Cal.3d at p. 818.) As noted, *ante, Brandt* does not reveal whether it was an hourly fee or a contingent fee case, and the separate lawsuit model was used to underscore which fees were attributable to which cause of action. No more should be read into this single line in *Brandt*; we certainly do not view that single sentence as establishing a limiting principle for contingent fee cases, an issue *Brandt* did not consider.

Allstate's proposed method of calculating *Brandt* fees also erroneously assumes that a client who agrees to pay a 40 percent contingent fee will never pay more than 40 percent of the contract recovery to obtain that recovery. But a client paying his or her lawyer an hourly fee may choose to pay more than 40 percent (or even more than 100 percent) of an anticipated contract recovery in order to obtain that recovery. The same is true for a client operating under a contingent fee agreement. Certainly nothing in *Brandt* limits the amount of fees awarded as damages to a percentage of the contract benefits. We held in *Brandt* only that such fees "may not exceed the amount *attributable to the attorney's efforts* to obtain the rejected payment due on the insurance contract." (*Brandt, supra,* 37 Cal.3d at p. 819, italics added.) That amount, even in a contingency fee case, could exceed a set percentage of the contract benefit. Indeed, in either an hourly or a contingent fee case, the amount "attributable to the attorney's efforts" to obtain the contract benefits could conceivably exceed those benefits entirely.

*Campbell v. Cal-Gard Surety Services, Inc., supra,* 62 Cal.App.4th 563 (*Campbell*), is illustrative. In that case, the insurer promised to pay the insured $2,500 if her car was stolen while equipped with a certain antitheft system. When the insured made a claim after her car was stolen despite the antitheft system, the insurer failed to pay. The insured sued on the contract and for bad faith; she recovered $2,500 on the contract, $7,288 for emotional distress, and $64,417 in punitive damages. (*Id.* at p. 569.) The trial court denied her *Brandt* fees, but the Court of Appeal reversed. Because the insured documented that the amount of attorney fees attributable to the contract cause of action was $13,010, and the defendant did not contest the amount, the appellate court directed the trial court, on remand, to enter an order awarding her that amount. (*Id.* at pp. 572, 575.)

The appellate court in *Campbell* correctly awarded *Brandt* fees in an amount greater than the benefits owing under the contract. The key question is how much did it cost the insured—how much were her damages—to hire an attorney when her insurer acted in bad faith and denied the benefits due her under her policy. As the appellate court held: "At trial she documented that amount to be $13,010. [Her insurer] did not challenge the reasonableness of the amount." (*Campbell, supra,* 62 Cal.App.4th at p. 572.) Had the court limited the recoverable *Brandt* fees to a set percentage of the contract recovery, the plaintiff in *Campbell* would not have received the full measure of her policy benefits.[13]

---

[13] As we explain, *post,* to the extent the trial court in *Campbell* awarded *Brandt* fees in excess of the amount of legal fees for the tort and contract recoveries combined, it abused its discretion. As noted, however, the defendant in *Campbell* did not contest the amount of *Brandt* fees.

As in *Campbell, supra,* 62 Cal.App.4th 563, the fees attributable to obtaining the contract recovery for the Cassims may have exceeded the amount of their policy benefits. Plaintiffs argued that a large number of issues on which their attorney toiled were related to both the tort and contract causes of action. Substantial evidence supports the claim that many of the legal issues were intertwined. For example, as plaintiffs argued below, in order to prevail both on the contract claim *and* on the tort claim, they were required to refute Allstate's assertion that they were responsible for starting the fire. Similarly, in order to prevail both on the contract claim *and* on the tort claim, the Cassims were required to refute Allstate's position that the policy was void and unenforceable due to their alleged material misrepresentations in submitting falsified receipts for their living expenses. Herzog's failure to prevail on either of these issues would have precluded a recovery on both the contract and the tort causes of action.

Theoretically, the opposite could also be true. That is, the amount of legal fees attributable to the contract might be less than 40 percent of the contract recovery. Were we to preclude defendant Allstate from attempting to prove the damages flowing from its breach were less than 40 percent of the contract recovery, we arguably would deprive it of important rights as well.

Focus on the work plaintiffs' attorney did in this case, what *Brandt* termed "the attorney's efforts" (*Brandt, supra,* 37 Cal.3d at p. 819), is thus relevant, but not because he is deserving of some fair measure of compensation for his work. In agreeing to a contingent fee arrangement, he accepted the risk that the recovery would be small or nonexistent. Focus on the attorney's work is relevant instead because, plaintiffs having received a sizeable tort recovery, the 40 percent contingent fee they were required to pay their attorney was also sizeable. To the extent some portion of that legal fee represents legal work that was related to both the tort and the contract recoveries and was thus at least partially *"attributable to the attorney's efforts to obtain the rejected payment due on the insurance contract"* (*ibid.,* italics added), failure to reimburse plaintiffs for a portion of that shared amount would necessarily diminish their contract recovery and violate *Brandt*'s premise that plaintiffs should recover, as tort damages, the legal fees incurred to recover their policy benefits. Accordingly, we reject Allstate's argument that *Brandt* fees in this case should have been limited to 40 percent of the benefits owing under the contract.

Our conclusion does not necessarily mean the trial court's award to plaintiffs of over $1 million in *Brandt* fees was correct. The parties apparently agreed to submit the matter on their pleadings, and the trial court made no findings in ruling for plaintiffs. Nothing in the record indicates how the trial court arrived at its figure, although the amount is roughly equal to 33-1/3

percent of the compensatory damage award.[14] We may thus speculate that the trial court largely accepted plaintiffs' claim that all of their attorney's legal work comprised an undifferentiated whole, with all work attributable to both the contract and tort causes of action. Plaintiffs' proffered justification has some plausibility, for Herzog's efforts to establish that plaintiffs neither set fire to their own home nor intentionally misrepresented their losses and interim living expenses were relevant to proving both Allstate's failure to pay benefits under the insurance policy and its bad faith in handling the claim.

Permitting plaintiffs, however, in a mixed contract/tort case, to recover the majority of their attorney fees attributable to the entire compensatory damages award (here, about 83 percent of those fees), is inconsistent with the premise of our decision in *Brandt, supra,* 37 Cal.3d 813. Beginning with the general rule that parties are expected to shoulder their own legal fees, we recognized in *Brandt* only a limited exception to that rule. We have no doubt that many bad faith insurance cases involve an identity of several issues, requiring counsel to work simultaneously on tort and contract issues. (See Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 13:129, p. 13-28 ["The attorney's efforts are often directed at *both* the contract and bad faith claims"].) Nevertheless, the premise of our decision in *Brandt* is that a plaintiff is entitled to only a portion of the overall legal fees as damages. As one treatise author advises, if an attorney spends time "in pursuit of both contract and extracontractual claims simultaneously, plaintiff should be entitled to *a portion* of any nonsegregated fees and costs for pursuing these joint claims." (*Id.,* ¶ 13:135, p. 13-29, italics added.) Thus, to the extent some overlap in legal work occurs, the trial court should exercise its discretion to apportion the fees.

Moreover, that virtually all of the legal work in this case was indivisibly attributable to both the contract and tort causes of action seems unlikely. For example, common sense suggests that fees attributable to legal work relevant to establishing the existence and valuation of the emotional distress the Cassims suffered as a result of Allstate's bad faith are fairly apportionable to only the tort causes of action and are thus not properly includable in the *Brandt* fees. Other issues, such as the reason for the low estimate for the replacement value of the lost home furnishings and Birkmeyer's insistence that the Cassims fire Thompson as a condition of receiving a settlement, also seem relevant only to the bad faith cause of action.

Having found fault with the methods of calculating *Brandt* fees proffered by both parties, we turn to explaining the proper method of calculating such damages in a contingent fee context. This method requires

---

[14] Thirty-three and one-third percent of $3,594,600 is $1,197,001.80. The Cassims were awarded *Brandt* fees of $1,193,533.

the trier of fact to determine the percentage of the legal fees paid to the attorney that reflects the work attributable to obtaining the contract recovery. Some outer limits are immediately discernible. First, no portion of legal fees attributable to the punitive damage award can be recovered as *Brandt* fees. *Brandt*'s focus was solely on ensuring that attorney fees for contract recovery did not diminish a plaintiff's compensatory damages award, and did not concern diminution of the punitive damages award, which is essentially a windfall for plaintiffs that the law permits for public policy reasons. Second, the *Brandt* fees can never exceed the legal fees for the combined tort and contract recovery; in most cases the amount will be far less.

■ To determine the percentage of the legal fees attributable to the contract recovery, the trial court should determine the total number of hours an attorney spent on the case and then determine how many hours were spent working exclusively on the contract recovery. Hours spent working on issues jointly related to both the tort and contract should be apportioned, with some hours assigned to the contract and some to the tort. This latter figure, added to the hours spent on the contract alone, when divided by the total number of hours worked, should provide the appropriate percentage.

An example of this calculation, with numbers similar to the instant case, illustrates the point. Suppose the compensatory damages are $3,594,000. Suppose further that the attorney and the client have a 40 percent contingent fee agreement. The total legal fee for the compensatory award is thus 40 percent of $3,594,000, or $1,437,600. Now suppose counsel spent 1,500 hours on the case, and can prove this breakdown: 200 hours on issues related solely to the contract, 500 hours on issues relevant to both the contract and the tort, and 800 hours on issues related solely to the tort. The trial court could reasonably conclude that half the hours spent on the joint contract/tort issues are fairly attributable to the contract (i.e., half of 500 hours, or 250 hours), and thus 30 percent of the hours worked (200 hours plus 250 hours, divided by 1,500 total hours) is attributable to the contract recovery. Thirty percent of the total legal fee (30 percent of $1,437,600) is $431,280. This is the amount a trial court should award as *Brandt* fees in this hypothetical situation.[15]

---

[15] The concurring and dissenting opinion speculates that this calculation of *Brandt* fees will lead to "complicated and protracted litigation" (conc. & dis. opn., *post*, at p. 814) and that we offer "no guidance" for making an apportionment of hours jointly attributable to the tort and contract recoveries (*id.* at p. 818). But after nearly 20 years of experience with *Brandt*, we find no evidence trial courts or juries have struggled with this type of apportionment. (See *Diamond Woodworks, Inc. v. Argonaut Ins. Co.* (2003) 109 Cal.App.4th 1020, 1045 [135 Cal.Rptr.2d 736] [attorney's testimony concerning amount of fees incurred to obtain policy benefits was sufficient to support jury award of fees]; *Track Mortgage Group, Inc. v. Crusader Ins. Co.* (2002) 98 Cal.App.4th 857, 867–868 [120 Cal.Rptr.2d 228] [trial court did not abuse its discretion in apportioning fees based on a variety of factors].)

■ Defendants are protected from excessive *Brandt* fees in two ways. First, as in any tort case, the plaintiff bears the burden of proving by a preponderance of the evidence both the existence and the amount of damages proximately caused by the defendant's tortious acts or omissions. (See BAJI No. 2.60.) Accordingly, on remand, plaintiffs will bear the burden of demonstrating how the fees for legal work attributable to both the contract and the tort recoveries should be apportioned. (See *Slottow v. American Cas. Co.* (9th Cir. 1993) 10 F.3d 1355, 1362 [applying California law, indicating it is the plaintiff's burden to show how fees should be apportioned]; Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 13:128, p. 13-28 [it is the "plaintiff's burden to identify which fees and costs were incurred to recover the policy benefits"]; see also *id.,* ¶ 13:135, p. 13-29 [advising the plaintiff's counsel to "keep careful time records"].)[16]

■ Second, trial courts retain discretion to disregard fee agreements that appear designed to manipulate the calculation of *Brandt* fees to the plaintiff's benefit. For example, a client who enters a fee agreement in an insurance bad faith case in which an attorney will take 40 percent of the entire compensatory damage award as his fee for working to obtain the contract recovery, and agrees to work on the tort recovery pro bono, cannot expect to receive *Brandt* fees of 40 percent of the entire compensatory award.

Because the record fails to indicate that the trial court apportioned legal fees to ensure that the *Brandt* fee award reflected only those fees "attributable to the attorney's efforts to obtain the rejected payment due on the insurance contract" (*Brandt, supra,* 37 Cal.3d at p. 819), we conclude the court abused its discretion.

### CONCLUSION

The judgment of the Court of Appeal is reversed. As Allstate raised a number of legal issues left unresolved by the appellate court's reversal, the cause is transferred back to that court for further consideration. Should the appellate court find no other reversible error, it is directed to remand the case to the trial court and direct it to hold a new hearing on the proper apportionment of *Brandt* fees in accordance with the views stated herein.

George, C. J., Kennard, J., and Moreno, J., concurred.

---

[16] Plaintiffs contend defendant Allstate should bear that burden of proof on remand, citing *Mustachio v. Ohio Farmers Ins. Co.* (1975) 44 Cal.App.3d 358 [118 Cal.Rptr. 581]. In that case, decided before but cited with approval in *Brandt, supra,* 37 Cal.3d at pages 816–817, the Court of Appeal stated it "assume[d] . . . that the burden of proving the proper apportionment would rest with the insurer." (*Mustachio, supra,* at p. 364, fn. 7.) To the extent *Mustachio v. Ohio Farmers Ins. Co., supra,* 44 Cal.App.3d 358, suggests the insurer has the burden of establishing the proper apportionment of *Brandt* fees, it is disapproved.

**BAXTER, J., Concurring and Dissenting.**—The court's holding has two parts. In the first part, the court, without deciding whether the closing argument under review constituted misconduct, holds that any error was harmless. I join this part of the court's opinion, which is of importance to the parties to this litigation. In the second part, the court holds that plaintiffs are entitled to some unspecified percentage of their $3,594,600 compensatory damage award as "*Brandt* [1] fees, that is, the amount of attorney fees payable as damages." (Maj. opn., *ante*, at p. 805.) According to the majority, the correct percentage depends on "the percentage of the legal fees paid to the attorney that reflects the work attributable to obtaining the contract recovery," which will require the trial court first to "determine the total number of hours an attorney spent on the case" and "how many hours were spent working exclusively on the contract recovery." (*Id.* at p. 812.) The trial court must next determine how many hours were "spent working on issues jointly related to both the tort and contract" and then, without any criteria to guide its decision, apportion "some hours . . . to the contract and some to the tort." (*Ibid.*) "This latter figure, added to the hours spent on the contract alone, when divided by the total number of hours worked, should provide the appropriate percentage." (*Ibid.*)

This complicated yet uncertain method of calculation, which must nonetheless be applied every time an insured prevails on a claim of a breach of the implied covenant of good faith and fair dealing, all but guarantees increasingly complicated and protracted litigation over *Brandt* fees. Because a request for *Brandt* fees will now "result in a second major litigation" (*Hensley v. Eckerhart* (1983) 461 U.S. 424, 437 [76 L.Ed.2d 40, 103 S.Ct. 1933]), I respectfully (and regretfully) dissent.

The majority discusses the issue of *Brandt* fees at length and gives preclearance to a variety of hypothetical fee awards not presented here (such as approving a *Brandt* fee award, when the attorney is retained on an hourly basis, in excess of the damages recoverable under the policy itself)[2] but nowhere acknowledges the *purpose* of *Brandt* fees. My analysis begins there.

In *Brandt*, we held that "[w]hen an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain benefits due under a policy, it follows that the insurer should be liable in a tort action for that

---

[1] *Brandt v. Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796] (*Brandt*).

[2] Unlike the majority, I will confine my discussion to the fee agreement at issue here— plaintiffs' agreement to pay counsel 40 percent of any recovery. The majority's discussion concerning the proper calculation of *Brandt* fees under an hourly fee agreement is obiter dicta. (See maj. opn., *ante*, at p. 812.)

expense. The attorney's fees are an economic loss—damages—proximately caused by the tort." (*Brandt, supra,* 37 Cal.3d at p. 817.) The purpose of this rule is obvious: in order to be made whole, the insured in such circumstances must recover the policy benefits in full, undiminished by the attorney fees reasonably incurred to recover those policy benefits. The attorney fees reasonably incurred to recover the policy benefits thus are damages suffered by the insured "in the same way that medical fees would be part of the damages in a personal injury action." (*Id.* at p. 817.)

We underscored the purpose of a *Brandt* fee award by emphasizing that "[f]ees attributable to obtaining any portion of the plaintiff's award which exceeds the amount due under the policy are *not* recoverable." (*Brandt, supra,* 37 Cal.3d at p. 819, italics added.) The reason that "[t]hese fees must be distinguished from recovery of attorney's fees *qua* attorney's fees, such as those attributable to the bringing of the bad faith action itself" (*id.* at p. 817) is that *Brandt* is not designed to make the insured whole for *all* of the attorney fees incurred as a result of the insurer's tortious conduct. Rather, *Brandt* merely entitles the insured to all of the benefits due under the policy, undiminished by the expenses incurred in retaining an attorney to recover under the policy.

In sum, "the theory of *Brandt* (and the cases on which it relies) . . . [is] that a plaintiff is entitled to be made whole for the harm he suffered by reason of the defendant's *tortious conduct* in denying benefits due under the insurance policy." (*Burnaby v. Standard Fire Ins. Co.* (1995) 40 Cal.App.4th 787, 795 [47 Cal.Rptr.2d 326]; *May v. Miller* (1991) 228 Cal.App.3d 404, 408 [278 Cal.Rptr. 341] ["The theory is the insured is not made whole unless such fees are awarded"]; *Fuhrman v. California Satellite Systems* (1986) 179 Cal.App.3d 408, 430 [225 Cal.Rptr. 140, 231 Cal.Rptr. 113] (conc. & dis. opn. of Sims, J.) ["The court's answer to that question is that where a plaintiff is necessarily required to pay attorneys to make the plaintiff whole as a result of a tort, amounts paid by the plaintiff to the attorneys are compensatory tort damages and not attorneys' fees"], disapproved on other grounds in *Silberg v. Anderson* (1990) 50 Cal.3d 205, 219 [266 Cal.Rptr. 638, 786 P.2d 365].)

What damages would be necessary to make plaintiffs whole in this case? Plaintiffs agreed to pay their attorney 40 percent of any damages recovered. The tort and punitive damages need not concern us here, though, inasmuch as *Brandt* was not intended to make the plaintiff whole for the cost of retaining an attorney to recover tort or punitive damages. Rather, *Brandt* fees allow the plaintiff to recover the policy benefits in full, undiminished by the "attorney's fees incurred in connection with the contract cause of action." (*Brandt, supra,* 37 Cal.3d at p. 816.) Accordingly, plaintiffs' out-of-pocket expense for

retaining an attorney to recover benefits due under the policy is the portion of the policy benefits the attorney is claiming—i.e., 40 percent. That amount will make plaintiffs whole.[3]

Indeed, had the jury failed to return a verdict on the tort causes of action, "plaintiffs would have been out of pocket exactly 40 percent of the contract recovery." (Maj. opn., *ante*, at p. 808.) Similarly, "[i]f the insured were to recover benefits under the policy in a separate action before suing on the tort, the distinction between fees incurred in the policy action, recoverable as damages, and those incurred in the tort action, nonrecoverable, would be unmistakable." (*Brandt*, *supra*, 37 Cal.3d at p. 818.) Once again, the insured would be out of pocket 40 percent of the contract recovery. Likewise, if the trial court were to bifurcate the causes of action and try the contract claim first, plaintiffs again would be out of pocket only the 40 percent of the contract recovery. (*Textron Financial Corp. v. National Union Fire Ins. Co.* (2004) 118 Cal.App.4th 1061, 1074–1075 [13 Cal.Rptr.3d 586] [affirming *Brandt* fee award limited to 40 percent of the recovery under the policy].)

The majority, however, refuses to embrace this logical solution. In its view, none of these hypotheticals applies here because plaintiffs *did* prevail on their tort claim and the tort claim and contract claim were tried together. This is true, but irrelevant. That plaintiffs prevailed on their tort claim affects their *entitlement* to—but not the *amount* of—*Brandt* fees, since their out-of-pocket expenses for recovering under the policy remain unaffected by any tort recovery (or, for that matter, by their punitive damages award). That the contract and tort causes of action were tried simultaneously rather than sequentially is equally beside the point. Whether the claims are tried together or separately, in separate trials or in bifurcated proceedings, the out-of-pocket cost to the plaintiff under a contingent fee agreement remains the same. We said as much in *Brandt*, where we observed there is " 'no disadvantage to defendant in the fact that the causes, although separate, were concurrently tried.' " (*Brandt*, *supra*, 37 Cal.3d at p. 818.)

The majority's fundamental error is in failing to acknowledge the purpose of the *Brandt* rule. Only by failing to comprehend the purpose of a *Brandt* fee award could the majority assert (1) that *Brandt* might authorize an award of *less* than 40 percent of the contract recovery in this case, even though plaintiffs are obligated to pay their attorney 40 percent of the contract recovery (maj. opn., *ante*, at p. 810); *and* (2) that an award of only 40 percent

---

[3] No party disputes that these fees were "reasonably incurred" to recover benefits due under the policy. (*Brandt*, *supra*, 37 Cal.3d at p. 815, fn. 1.)

of the contract amount "would necessarily diminish their contract recovery." (*Ibid.*) Inasmuch as plaintiffs' out-of-pocket cost in this case was 40 percent of the contract recovery, an award less than that would necessarily undercompensate plaintiffs, while an award equal to that could not possibly diminish their contract recovery. Hence, neither of the majority's assertions is true.

By untethering *Brandt* from its moorings, the majority inevitably finds itself at sea. I do not dispute that the legal issues in this litigation were to some extent intertwined or that some portion of the attorney's work was used for both the contract and tort claims. But, under a contingent fee agreement, the nature and extent of the work actually performed is *irrelevant* to the costs actually incurred by the client. (*Rader v. Thrasher* (1962) 57 Cal.2d 244, 253 [18 Cal.Rptr. 736, 368 P.2d 360] [" '[a] contingent fee contract, since it involves a gamble on the result, may properly provide for a larger compensation than would otherwise be reasonable' "]; accord, *Mau v. Woodburn, Forman, Wedge, Blakey, Folsom & Hug* (Nev. 1964) 80 Nev. 184 [390 P.2d 721, 722] [under a contingent fee arrangement, "compensation is not related to services actually performed"].) In other words, regardless of whether almost all or virtually none of the work undertaken for the contract claim was also applicable to the tort claim, plaintiffs' out-of-pocket costs to retain an attorney—and, in particular, their costs to recover on the contract—remained the same.[4] That is why we said in *Brandt* that "[f]ees attributable to obtaining *any* portion of the plaintiff's award which exceeds the amount due under the policy are not recoverable." (*Brandt, supra,* 37 Cal.3d at p. 819, italics added.)

Without any support in *Brandt,* the majority is forced to rely heavily (but only inferentially) on a single Court of Appeal decision, *Campbell v. Cal-Gard Surety Services, Inc.* (1998) 62 Cal.App.4th 563 [73 Cal.Rptr.2d 64] (*Campbell*), in which the *Brandt* fee award did exceed the contract recovery. The problem with *Campbell,* of course, is that the Court of Appeal supplied no legal analysis for its ruling, nor did it provide the basis for its calculation. It relied instead on the fact that the defendant insurer "*did not challenge the reasonableness of the amount.*" (*Id.* at p. 572, italics added.)[5]

I would rely instead on *Textron Financial Corp. v. National Union Fire Ins. Co., supra,* 118 Cal.App.4th 1061, a subsequent decision by the same

[4] If (as I propose) plaintiffs must pay their attorneys 40 percent of their recovery under the policy and then are awarded the same 40 percent as *Brandt* fees, I am puzzled how such an award "would necessarily result in a diminution of their policy benefits." (Maj. opn., *ante,* at p. 808.)

[5] The entirety of the Court of Appeal's reasoning can be set forth here in full: "Campbell concedes that she is only entitled to her attorney fees attributable to the contract cause of action. At trial she documented that amount to be $13,010. [Defendant] did not challenge the reasonableness of the amount." (*Campbell, supra,* 62 Cal.App.4th at p. 572.)

division that decided *Campbell*, but which the majority fails to discuss or even cite. In *Textron*, as in this case, the plaintiff retained legal counsel under an agreement entitling counsel to 40 percent of any recovery. The plaintiff, like plaintiffs here, recovered contract and tort damages as well as punitive damages. The trial court awarded *Brandt* fees equal to 40 percent of the amount recovered under the policy, and the plaintiff appealed. The Court of Appeal affirmed: "The retainer agreement required plaintiff to pay counsel 40 percent of all sums recovered in this action. It had no further legal obligation to pay counsel for the legal services rendered to it. *Brandt* held the 'fees recoverable . . . may not exceed the amount attributable to the attorney's efforts to obtain the rejected payment due on the insurance contract.' [Citation.] Plaintiff cites no authority permitting a posttrial modification of the retainer agreement. The trial court did not err by limiting the damage award under *Brandt v. Superior Court, supra,* 37 Cal.3d at p. 813 to the percentage specified in the parties' contingency agreement." (*Textron, supra,* at p. 1075.)

Finally, the majority's approach suffers from a number of fatal inconsistencies and uncertainties. For example, under the majority's approach, the trial court must apportion hours spent working on issues jointly related to both the tort and contract, "with some hours assigned to the contract and some to the tort." (Maj. opn., *ante,* at p. 812.) But the majority offers no guidance for making such an apportionment. The majority's hypothetical assumes that the trial court "could reasonably conclude that half the hours spent on the joint contract/tort issues are fairly attributable to the contract" but fails to explain why that would be so. (*Ibid.*) Indeed, the majority fails to foreclose other apportionment methods (such as 95 percent to the contract and 5 percent to the tort, or vice versa). Yet, at another point, the opinion states in passing that plaintiffs may not recover "the majority of their attorney fees attributable to the entire compensatory damages award" (*id.* at p. 811), which suggests the existence of some arbitrary (but unknown) upper limit on the apportionment.

Later on, the majority advises that, as an "immediately discernible" outer limit, "the *Brandt* fees can never exceed the legal fees for the combined tort and contract recovery." (Maj. opn., *ante,* at p. 812.) But in *Campbell*—the only "illustrative" case the majority has been able to find (maj. opn., *ante,* at p. 809)—the *Brandt* fee award of $13,010 substantially exceeded *the entire compensatory damage award* (*Campbell, supra,* 62 Cal.App.4th at p. 569 [$2,500 for the contract claim; $7,288 for the tort claim].) The *Brandt* fee award therefore *greatly* exceeded the legal fees for the combined tort and contract recovery, since the case was handled on a contingent fee basis. (*Campbell, supra,* 62 Cal.App.4th at pp. 569, 572.)

It is not surprising the majority has no ready sense of how the apportionment of attorney efforts jointly attributable to both contract and tort theories might actually be made, since it is *not* our practice to apportion fees when, as here, they are "incurred for representation on an issue common to both a cause of action in which fees are proper and one in which they are not allowed." (*Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129–130 [158 Cal.Rptr. 1, 599 P.2d 83]; see also *Del Cerro Mobile Estates v. Proffer* (2001) 87 Cal.App.4th 943, 951 [105 Cal.Rptr.2d 5] ["since Del Cerro's two causes of action arose from a common core of operative facts, the court was not required to apportion the attorney fees incurred by Proffer between those causes of action"].) Trial courts thus will find no guidance in the majority opinion.

Another inconsistency involves the tension between, on the one hand, the majority's statement that fees for legal work on issues that are intertwined with the contract issue are recoverable under *Brandt* and, on the other hand, the majority's other "immediately discernible" limitation that *Brandt* fees must exclude legal fees related to the punitive damage award. (Maj. opn., *ante*, at p. 812.) If, as the majority contends, an entitlement to fees beyond those necessary to make the plaintiff whole arises whenever some portion of the attorney's efforts are jointly attributable to contract and tort theories, then logic suggests the same would be true when (as here) a portion of the attorney's efforts are jointly attributable to contract and punitive damage theories. A review of plaintiffs' closing argument reveals that the asserted lack of evidence for some of Allstate's allegations—which the majority concedes was part of the contract litigation—was *also* part of plaintiffs' contention that Allstate was "trying to set these people up" and had therefore acted with "malice," which was essential to an award of punitive damages. Thus, the majority's logic, if taken seriously, would require the trial court to apportion this legal work among the contract, the tort, *and* punitive damage awards. The majority offers no legitimate reason for refusing to do so.

*Brandt* entitles the plaintiff insured to full recovery of policy benefits, undiminished by the attorney fees incurred to recover those benefits. In this case, where the attorney was retained under a contingent fee agreement of 40 percent, the correct award is 40 percent of the recovery under the policy. The method proposed by the majority is not only inconsistent with *Brandt* but will

also burden the system with bitterly contested litigation over which contract issues are intertwined with the tort claims and how legal work on such issues should be apportioned. Because this method is predictably unwise and unworkable, I respectfully dissent.

Brown, J., and Sims, J*., concurred.

Appellant's petition for a rehearing was denied October 13, 2004, and the opinion was modified to read as printed above. Chin, J., did not participate therein.

---

* Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, Section 6 of the California Constitution.