Filed 6/14/22  In re A.G. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re A.G., et al., Persons Coming Under Juvenile Court Law. | B315684 |
| _____ | (Los Angeles County Super. Ct. No. 19CCJP02605D-E) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| I.G., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Daniel Zeke Zeidler, Judge.  Affirmed.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey F. Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

Father appeals from an order under Welfare and Institutions Code section 366.26 terminating his parental rights to his son and daughter.[1] Father contends the juvenile court erred when it used the clear and convincing standard of proof in rejecting the parent-child beneficial relationship exception. We conclude the error was harmless: even if the trial court had employed the correct preponderance of the evidence standard, the court necessarily would have found father failed to demonstrate that terminating the parental relationship would be detrimental to the children.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Dependency History

The parents have two children together: daughter born in 2013, and son born in 2014. In 2015, the juvenile court took dependency jurisdiction over the children, finding that mother left them with maternal grandmother without making an appropriate plan for their ongoing care, mother's unmedicated bipolar disorder endangered the children, and father failed to protect the children from mother's known mental health and emotional problems. During the pendency of the case, father failed to complete court-ordered programs. In December 2015, the juvenile court terminated jurisdiction and awarded primary physical custody of the children to mother.[2]

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

[2] At the time, mother and father were separated.

By 2018, mother was living with her new boyfriend in a car and using drugs. Meanwhile, the children were splitting time between maternal grandmother's home and paternal grandparents' home, where father lived.

In 2019, mother gave birth to M.C. (mother's boyfriend is M.C.'s father). In June 2019, due to mother's ongoing drug use and the fact that the children were in her custody, the juvenile court asserted dependency jurisdiction over all three children. With respect to son and daughter, the juvenile court terminated jurisdiction with a custody order granting father sole legal and physical custody. M.C.'s dependency case continued.[3]

## 2. *The Children Allege Sexual and Physical Abuse in Father's Home*

Beginning in the summer of 2019, the children lived (at least part of the week) in paternal grandparents' home with paternal grandparents, father, and a paternal uncle. In October 2019, then-six-year-old daughter disclosed to maternal grandmother, police, and the Department of Children and Family Services (DCFS) that paternal uncle had sexually abused her in the home of paternal grandparents. Daughter reported that paternal uncle touched her vagina several times, had sex in front of her, showed her pornography, and threatened to slap her if she reported the abuse. Son, who was five years old at the time, reported the uncle touched his penis, and hit him in the stomach and penis. Son stated he watched the uncle have sex with his

---

[3] The dependency case involving M.C., Los Angeles County Superior Court case No. 19CC02605C**,** is not the subject of the present appeal.

girlfriend. Evidence was that the abuse occurred when father was at work and paternal grandmother was away.[4]

Daughter reported that she had told father of the sexual abuse but father did nothing to address it. Father told DCFS that the children were lying and being coached by maternal grandmother. During this period, father had an outstanding warrant based on an arrest for being drunk in public. Father tested positive for marijuana, then stopped drug testing.

In late October 2019, DCFS detained the children from father, and filed a dependency petition alleging that the children's paternal uncle physically and sexually abused both children and that father failed to protect them from the uncle. DCFS also alleged mother had a history of substance abuse and mental health problems.[5] DCFS placed the children with maternal grandmother.

## 3.	*Jurisdiction and Disposition*

At the January 6, 2020 combined jurisdiction and disposition hearing, the parents pled no contest to an amended petition. In accepting the plea, the juvenile court found father knew or reasonably should have known about the abuse perpetrated by paternal uncle.

The juvenile court removed the children from parental custody, and ordered reunification services for both parents. Father was required to participate in individual counseling and submit to six consecutive drug tests. If he tested positive or

---

[4]	The record does not state paternal grandfather's whereabouts when the abuse occurred.

[5]	The children's younger half-sibling, M.C., was not named in this petition because he was already a dependent child.

4

missed a test, he would be required to complete a drug treatment program.

### 4. *Failed Reunification Efforts*

Father made modest progress in individual counseling.[6] In November 2020, father's therapist reported that father appeared immature and sheltered by his parents, and that he did not appreciate the seriousness of the dependency case. In April 2021, the therapist reported that, although father showed more maturity, father (then 28 years old) was "still like a teenager himself" and needed to learn "how to regulate his emotions" and take responsibility for the children.

On multiple occasions beginning in January 2020, father tested positive for illicit substances. Father failed to enroll in the required drug treatment program.

With the exception of a three-month period beginning in March 2020 (at the start of the pandemic), father consistently participated in weekly, two-hour supervised visitation with the children, typically at a park. During visits, father often was "attentive and appropriately interactive with the children, inclusive of giving encouragement, praise and redirection as necessary." In July 2020, DCFS reported the children enjoyed visitation.

In a December 2020 report, DCFS described father's visits as mostly positive: "Father has always provided food for the visits but relied heavily on cell phone video games to appease the children, especially [son] who loves playing video games. With the monitors' guidance, father has learned to talk with the children about their likes and provide activities which he and the

---

[6] As father is the only appellant and his relationship with the children is at issue, we focus our discussion on him.

children can enjoy together." Although father was initially resistant to monitoring, he later embraced the monitor's assistance "once he was able to see that his visitation had become more enjoyable." DCFS noted "that when paternal grandparents are at the visit, father has a tendency to regress in taking charge and submits to paternal grandmother's directives."

In May 2021, DCFS explained that although father was attentive and interactive with the children, he did not actively engage with them by "inquiring and planning visitation activities." The visits revolved around a snack or meal with the children, and father was "irritated when the children do not want to eat the food he provides or do not want to interact with him, other than playing at the playground or using his cell phone." Father also consistently failed to follow visitation and social distancing rules, and became defensive when he was reminded of those rules.

Father frequently spoke negatively to the children about their maternal relatives. On one occasion when the monitor asked him to refrain from doing so, father became loud and argumentative, telling the monitor: " 'I don't give a fuck, those are my kids and I can tell them whatever I want. You are calling me a liar in front of my kids and you are not shit.' " Paternal grandfather asked father to calm down several times but he continued to threaten the monitor. The children appeared worried and stared at the ground. The monitor ended the visit, and the children gathered their things without looking at father. Neither child wanted to say goodbye to father or paternal grandparents. Daughter told the monitor "This was not a good visit, I want to go with my aunt." Son stated, "My dad was saying bad words, that's not good."

6

During a March 2021 visit, father and paternal grandmother argued and daughter asked to end the visit early.

The following week, daughter refused to attend the visit out of fear that the uncle who abused her would show up.[7] Father did not credit daughter's fears and instead blamed maternal grandmother for daughter's statement. According to the investigating social worker, father in fact never believed the children's allegations of abuse.

The next visit went well and father told daughter he had missed her. During a visit in April 2021, daughter repeatedly asked to leave the visit to go home. During another visit in April 2021, both children were reluctant to engage with father and paternal grandmother. Both wanted to leave early, which they did.

At the 18-month review hearing held on April 29, 2021, the juvenile court terminated father's reunification services due to noncompliance, and scheduled a hearing to consider termination of parental rights under section 366.26.[8] Both children remained with maternal grandmother, who was approved to adopt them.

Father continued to visit the children. In September 2021, the social worker reported that father was "attentive, appropriately interactive with the children and plans for his visits."

---

[7]     Daughter suffered from extreme anxiety and weekly nightmares related to the sexual abuse.

[8]     At the 12-month review hearing held December 17, 2020, the juvenile court had terminated mother's reunification services, but extended reunification for father.

### 5.    *Termination of Parental Rights*

At the September 2, 2021 section 366.26 hearing, neither parent appeared.  Counsel for both parents and the children were present.  The juvenile court stated it was considering the entire contents of the court file, specifically referencing the section 366.26 and last minute information reports.

Father's counsel asked the juvenile court to apply the beneficial relationship exception based on DCFS's reports describing father's contact with the children.  Father's counsel argued:  "He's provided food for the children during his visits.  He talks with the children about their likes and dislikes.  And he provided activities at the visits that he and the children can enjoy together.  [¶]  Father also planned for his visits.  He was attentive, and he appropriately interacted with the children.  And even in light of the challenges brought by the pandemic, this father still did maintain consistent visitation with the children.  [¶]  So father would believe that these visits have conferred a parental role, and that the benefits of this relationship do outweigh the benefits of permanence."

 Children's counsel and DCFS both asked the juvenile court to terminate parental rights.  Children's counsel argued that "while the father has maintained regular and consistent visitation, this has not conferred a fully parental role as to the father, as the visits have never gone beyond monitored.  They occur but once a week.  [¶]  And quite frankly, the father has continued to not recognize the children's needs for security by remaining in the same home where the abuse that led the original allegations arise took place."

The juvenile court rejected the beneficial relationship exception and terminated parental rights.  The juvenile court

8

explained: "Father has maintained regular and consistent visitation and contact. He visits on Sundays for two hours monitored. [¶] For the reasons stated by [children's counsel], the court cannot find by clear and convincing evidence that it would be detrimental to sever the parent/child relationship. [¶] Although the visits and contact have conferred a parental role and/or relationship, it has not been shown to outweigh the benefits of permanence in adoption."

Father timely appealed.

## DISCUSSION

Father argues the court erred when it found there was no parent-child beneficial relationship exception to adoption because it applied the heightened clear and convincing evidence standard of proof. We agree the application of that standard was error. However, we conclude the error was harmless.

### 1. The Parent-child Beneficial Relationship Exception

When the juvenile court finds that a dependent child is likely to be adopted, it must terminate parental rights and select adoption as the permanent plan unless it finds that termination would be detrimental to the child under one of several exceptions. (*In re Caden C.* (2021) 11 Cal.5th 614, 629, 631 (*Caden C.*)) If the child is likely to be adopted, "adoption is the norm." (*In re Celine R.* (2003) 31 Cal.4th 45, 53 (*Celine R.*).) "[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350, disapproved of on another ground by *Caden C.*, at p. 636, fn. 5.)

Under the parent-child beneficial relationship exception to adoption, the parent must "establish, by a preponderance of the evidence," "(1) regular visitation and contact, and (2) a

9

relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*Caden C., supra,* 11 Cal.5th at pp. 629, 631 ["What it requires a parent to establish, by a preponderance of the evidence, is that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child."].) The first element is straightforward. For the second element, "the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their parents." (*Id.* at p. 632.) As to the last element, "[w]hat courts need to determine, therefore, is how the child would be affected by losing the parental relationship — in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.)

When assessing whether the parental-benefit exception applies, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) Essentially, "the exception applies in situations where a child

10

cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C., supra,* 11 Cal.5th at p. 631.)

We review the juvenile court's findings on the first two elements – visitation and the existence of a beneficial parent-child relationship – for substantial evidence. (*Caden C., supra,* 11 Cal.5th at p. 639.) We review for abuse of discretion the court's assessment whether termination of parental rights would be detrimental to the child. (*Id.* at p. 640.) We review de novo father's claim that the juvenile court applied the incorrect standard of proof, as it presents a question of law. (See *In re Quentin H.* (2014) 230 Cal.App.4th 608, 613–614.)

**2.** ***Harmless Error***

Father's sole claim of error is that the juvenile court used the incorrect burden of proof in deciding the third element. The court essentially found that the first two elements were met. Father, for good reason, does not address the court's findings on those elements, nor does respondent seriously quarrel with those findings. Respondent does not expressly concede the trial court erred in applying a clear and convincing standard to the third element, but, instead, argues that any error was harmless. Putting aside the possibility that the experienced dependency judge may have just misspoke,[9] we agree with father that in articulating its ruling, the trial court appears to have put the

---

[9] Section 366.26 does use the "clear and convincing" standard in terms of whether the child is or is not likely to be adopted. (See Welf. & Inst. Code, § 366.26, subd. (c)(1), (i)(3).) No such standard appears in the parental-benefit exception under section 366.26(c)(1)(B)(i).

11

burden on father to prove by clear and convincing evidence that severing parental rights would be detrimental. We also agree that the clear and convincing standard is not the correct one, for our Supreme Court has held that a parent must prove detriment to a minor on termination of parental rights only by a preponderance of the evidence. (*Caden C., supra,* 11 Cal.5th at p. 629.)

Respondent's argument on appeal is succinctly stated: any error by the juvenile court in applying the clear and convincing burden of proof was harmless.

"The California Constitution prohibits a court from setting aside a judgment unless the error has resulted in a 'miscarriage of justice.' (Cal. Const., art. VI, § 13.)" (*Celine R.* (2003) 31 Cal.4th at pp. 59–60.) Both parties agree that that the test of harmless error in this setting is governed by *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). Applying the *Watson* standard to dependency cases, our Supreme Court has held that reversal in dependency cases is permitted only where "the reviewing court finds it reasonably probable the result would have been more favorable to the appealing party but for the error." (*Celine R.,* at pp. 59–60, citing *Watson*.) "A ' "probability" in this context does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility.' " (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1068. See *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.)

Here, there was no "reasonable chance" that the result would have been different if the dependency court had applied the preponderance of evidence burden of proof. At the section 366.26 hearing, aside from not showing up, father through counsel produced no evidence that showed how the children

12

would be negatively affected by termination of parental rights. Father relied entirely on DCFS's reports of father's visitation with the children. These reports included forced interactions and instances where the children wanted to return to their caregiver early. Recurrent themes throughout the reporting included father's lack of maturity, inability to plan activities for the children beyond eating and video games, and deficient parenting. At one particularly memorable visit, father spoke negatively of the maternal family and then berated the monitor with expletives in front of son and daughter. The children were visibly upset by father's behavior.

Although father showed consistent visitation and some enjoyable visits with the children, father was required to do more than show "frequent and loving contact." (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418.) "Interaction between [a] natural parent and child will always confer some incidental benefit to the child. . . . The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)

Although not expressed in the dependency court ruling, father refused to believe the children's allegations of sexual abuse despite outward manifestations of their trauma, and at times appeared to show great insensitivity on the subject. Over a year after the molestation, daughter "was diagnosed with extreme anxiety with weekly nightmares related to the sexual abuse by the paternal uncle." In March 2021, shortly after the 18-month hearing, daughter refused to visit with father due to this fear. In response to daughter's concerns, father "did not speak with [daughter]"; instead, he told DCFS "he feels that this is all the

13

maternal grandmother's doing and she is putting this thought on the children." DCFS reported: "Throughout the history of this case, it has been documented that the father fails to accept the children's disclosure of the sexual abuse they endured in the hands of the paternal uncle, . . . while in the care of the father. Thereby, the father's insight of sexual abuse and its effects on the children and the family dynamic remains limited."

If the dependency court had applied the preponderance burden of proof, we are confident that the court's orders would have been the same. Father's attitude toward the children's sexual abuse, his negativity toward the children's caregivers, and the absence of a close relationship between children and their father demonstrated that severing the parent-child relationship would not be detrimental to the children. Accordingly, we conclude the juvenile court's evidentiary standard error was harmless.

## DISPOSITION

The order is affirmed.

RUBIN, P. J.

WE CONCUR:

BAKER, J.

MOOR, J.

14