Filed 6/17/25  Vena v. Vena CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CHRISTINE VENA,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>NICHOLAS VENA,<br><br>    Defendant and Appellant. | D083479<br><br><br><br>(Super. Ct. No.: 19FL013961N) |

APPEAL from orders of the Superior Court of San Diego County, Victor M. Torres, Judge.  Affirmed in part; reversed in part; remanded with directions.

Neumann Family Law and Sara R. Neumann for Defendant and Appellant.

Law Office of Linda Cianciolo and Linda Cianciolo for Plaintiff and Respondent.

Nicholas (Nick) Vena appeals a retroactive child support order and a domestic violence restraining order (DVRO).  As to each of these orders, he contends the court abused its discretion and that he was prejudiced as a result.  We conclude the court made a computational error that inflated its award for part of the time encompassed by the child support order.  Hence we

direct the court to recompute its award of child support for the affected period. In all other respects, we affirm the two orders.

Both orders arise in the context of a contentious relationship between Nick and his former wife, Christine Vena.[1] Nick and Christine wed in 2002. Over the ensuing 17 years they had seven children, the eldest of whom now is 22 years old and the youngest of whom (twins) are six. In 2019, Nick and Christine separated. In 2021, the marriage was dissolved. In 2023, the court issued the two orders from which Nick appeals.

## I.
## GENERAL LEGAL PRINCIPLES

Before turning to the two orders, and before discussing the evidence and legal principles that pertain to them, we discuss a pair of legal principles governing our review on appeal. These are the standard of review and the prejudicial error rule.

### A. Standard of Review

As to both types of orders before us (child support and DVRO), it is well settled that our review is for an abuse of discretion. (See, e.g., *In re Marriage of Lim & Carrasco* (2013) 214 Cal.App.4th 768, 773 [child support]; *Salmon v. Salmon* (2022) 85 Cal.App.5th 1047, 1054 (*Salmon*) [DVRO].)

A court abuses its discretion only when its decision is arbitrary, capricious, or patently absurd. (*In re Caden C.* (2021) 11 Cal.5th 614, 641 (*Caden C.*).) Consequently, a reviewing court has no authority to substitute its decision for that of the trial court if more than one inference can reasonably be deduced from the facts (*ibid.*), and it "should interfere only

---

[1] Because the parties share the same last name, we refer to them here by their first names. We do so for the sake of clarity, intending no disrespect.

' "if . . . under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did." ' " (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.)

This said, a review for abuse of discretion may at times be tantamount to a review for substantial evidence. As our Supreme Court has said, "where . . . 'the appellate court will be evaluating the *factual basis* for an exercise of discretion, there likely will be no practical difference in application of the two standards.' " (*Caden C., supra,* 11 Cal.5th at p. 641; cf. *Salmon, supra,* 85 Cal.App.5th at p. 1054 [" 'abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review' "].)

Under the substantial evidence standard, "determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*Caden C., supra,* 11 Cal.5th at p. 640; see also *Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582 ["Our job is only to see if substantial evidence exists to support the verdict in favor of the prevailing party, not to determine whether substantial evidence might support the losing party's version of events."].) "This traditional standard of review is highly deferential. It has three pillars. First, we accept all evidence supporting the trial court's order. Second, we completely disregard contrary evidence. Third, we draw all reasonable inferences to affirm the trial court. . . . Under this standard of review, parties challenging a trial court's factfinding bear an 'enormous burden.' " (*Schmidt,* at pp. 581–582.)

## B.    Prejudicial Error Rule

If our review of the trial court proceedings reveal error, then we must further consider whether such error is harmless. (*F.P. v. Monier* (2017)

3

3 Cal.5th 1099, 1107–1108.) As our Supreme Court has observed, " 'reversible error is a relative concept,' " " 'whether a slight or gross error is ground for reversal depends on the circumstances in each case,' " and a reviewing court reverses a judgment " 'only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 (*Cassim*); see also *Sabato v. Brooks* (2015) 242 Cal.App.4th 715, 724–725 (*Sabato*).)

"A reasonable probability for these purposes does not mean an *absolute* probability" (*Sabato, supra,* 242 Cal.App.4th at p. 725), nor does it mean " 'more likely than not.' " (*Cassim, supra,* 33 Cal.4th at p. 800.) Rather, it means " 'merely a *reasonable chance*, more than an *abstract possibility*' " (*ibid*.), and "[t]he test is satisfied, and prejudice appears, if the case presents 'an equal balance of reasonable probabilities.' " (*Sabato,* at p. 725.)

In applying the principles discussed above to the two orders from which Nick appeals, we address the child support order before turning to the DVRO.

## II.
## CHILD SUPPORT ORDER

### A. Background

The child support proceedings in this case commenced in the spring of 2020, when Christine first filed a request seeking child support. Several months later, at the parties' request, the court appointed a privately compensated temporary judge (private judge) to resolve child support issues and to address various other matters. The private judge entered a child support order. However, she subsequently recused herself; and in 2022, at Nick's request, the court ruled that all of the private judge's orders were void.

4

In 2023, Christine filed a new request for child support. In a declaration, she asked that such support be awarded retroactively, in light of the fact that the support orders issued by the private judge had been deemed void. Nick filed multiple declarations in opposition to this request. There then ensued two hearings, a child support order, and, following the submission of additional declarations by the parties, the amended child support order that is a subject of this appeal.

In the amended child support order, the court found that "[b]oth parties can work . . . [b]ut apparently neither party chooses to work." Then it turned to the request for retroactivity. Noting that it was Nick who had moved for the private judge's orders to be declared void and that Nick had failed to pay the child support the private judge had ordered, the court concluded: "It is disingenuous for [Nick] to oppose retroactivity." Then the court proceeded to award child support for each of five distinct periods of time spanning May 1, 2020, through April 30, 2023.

## B.    Analysis

On appeal, Nick does not challenge the court's determination that child support should be awarded retroactively. But he does contend that three determinations affecting the court's computation of his income—and, by extension, its computation of child support—were an abuse of discretion.

### 1.    *Classification of a $137,627 Payment that Nick Received During 2020 as Income Instead of Property*

The first of the child support determinations that Nick contends were abuses of discretion pertains to $137,627 in funds that Nick received during 2020 from a business named Salted Stone. In making its child support determination, the court classified these funds as dividends—and thus

5

income (Fam. Code[2] § 4058, subd. (a)(1))—rather than as property in the form of repayment of a loan. This, according to Nick, was error.

In support of this position, Nick does not refer us to a promissory note or a statement of assets and debts, nor does he refer us to an interest calculation or any other evidence contemporaneous to the existence of the asserted loan. Instead, he focuses exclusively on the parties' declarations and contends: (1) that he "consistently testified the $137,627 paid by Salted Stone in 2020 was a loan repayment" and (2) that "Christine *agreed* that at least $125,000 [of that sum] was a loan repayment not a dividend."

Neither of these contentions is correct.

Regarding the first contention, Nick did testify in several passages of his declarations that the $137,627 was a loan repayment. But elsewhere in his declarations he referred to this sum as "*dividends*" and said "that money is '*income*.'" Turning to the second contention, Christine did indeed testify, in one passage of her declarations, that $125,000 of the $137,627 was "*potentially* attributable to a loan repayment"[3] and, in another passage, that the $137,627 was "property."[4] But, in the same passage in which she said, "it appears only $125,000 is *potentially* attributable to a loan repayment,"

---

[2]    All further statutory references are to the Family Code.

[3]    Nick correctly notes that this passage is the only evidence that the amended child support order cites to support its classification of the $137,627 as dividends, and that the passage in fact does not support that finding. But, as discussed *ante* and *post*, the court was presented with *other* evidence that *did* support the finding.

[4]    Nick also contends that, in an interrogatory response, Christine said the $137,627 was "a repayment of a community property loan." But the referenced interrogatory response does not appear in the record on appeal.

Christine indicated that she was not conceding that *any* of the $137,627 was in repayment of a loan: "I have no information," she declared, "on the amount of the loan, source of funds for the loan, or date of the loan." And, in the same sentence in which she called the $137,627 "property," she also called it "distributions."

On a record such as this—in which Nick testified that the $137,627 was "income," and in which Christine testified those funds were "distributions"—we cannot say that the court's finding in keeping with such testimony was unsupported by substantial evidence. Nor can we say that this finding was an abuse of discretion.

### 2.    *Accounting for $204,580 in Tax Refunds, Applicable to 2021, that Nick Received During 2022*

The second child support determination that Nick contends was an abuse of discretion pertains to two income tax refunds totaling $204,580 that Nick received during 2022: one for $163,054 from the Internal Revenue Service; and one for $41,526 from the Franchise Tax Board. In determining child support, the court classified this $204,580 in refunds as income for the year in which they were received—2022. But Nick contends this resulted in double-counting because (he says) this same amount had already been included as income for the prior year—2021.

Although Nick contends "Christine does not contest [his] claim that Judge Torres attributed the same income to Nick twice," that is not correct. To the contrary, Christine asserts that the court *correctly* considered the $204,580 in refunds as income for 2022 because (she says) "there was less income imputed to [Nick] in the previous year"—2021.

In all events, Nick's contention with respect to the tax refunds fails for the simple reason that the record on appeal does not reveal whether the income attributed to Nick for 2021 did in fact include the $204,580 in excess

7

withholding (as Nick contends) or did not include it (as Christine contends).[5] This silence in the record is fatal to Nick's argument that the amended child support order accounted for the same income twice. (See *Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609 ["[I]t is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment. [Citations. . . .] 'Failure to provide an adequate record on an issue requires that the issue be resolved against [the appellant].' "].) As a consequence, we cannot say that the court's inclusion of the $204,580 in its determination of 2022 income was error.

### 3. *Computational Error Affecting the Determination of Monthly Income that Nick Received from January 1, 2022, Through April 30, 2023*

The third child support determination that Nick contends was an abuse of discretion is a faulty computation the court used in determining monthly income for the 16-month period comprising January 1, 2022, through April

---

[5] Nick contends that among the components the court included in its determination of his income for 2021 was $3,813,540 in distributions that he received from the sale of a company to which he refers as P2P Holdco, and that this sum "included . . . the $204,580 over-withheld for taxes." But nowhere in the record do we see a K-1, a 1099, or any other evidence to support Nick's assertion that the $3,813,540 figure was *in*clusive, rather than *ex*clusive, of the $204,580 withheld for taxes.

Invoking dissomaster reports attached to the amended child support order, Nick also argues that: "All five dissomaster reports list Nick's income as 'non-taxable' and thus no taxes were deducted from Nick's income." But the mere fact that the dissomaster reports classified Nick's income as non-taxable does not mean that the $3,813,540 Nick received in distributions during 2021 from the sale of P2P Holdco represented the gross amount of such distributions rather than that amount net of tax withholding.

30, 2023.  The parties agree that the court found Nick's income during this period totaled $444,711 (including the tax refunds discussed *ante*).  However, it appears that, in converting the $444,711 into a monthly income figure, the court divided by 12, thereby arriving at a monthly income of $37,059, when it should instead have divided by 16.  Dividing by 16 yields a monthly income of $27,794.

The court plainly erred in using the $37,059 per month figure, rather than the $27,794 per month figure, to compute child support for this 16-month period.  And the error cannot reasonably be said to be harmless, inasmuch as "it is reasonably probable"—i.e., it is "more than an *abstract possibility*"—"that a result more favorable to [Nick] would have been reached in the absence of the error."  (*Cassim, supra,* 33 Cal.4th at p. 800.)  For these reasons, the court is directed on remand to recompute child support, for the 16-month period comprising January 1, 2022, through April 30, 2023, using an income figure of $27,794 per month for Nick.

### III.
### THE DVRO

The second order from which Nick appeals is the DVRO.  To furnish context for the proceedings that culminated in this order, we begin with a brief discussion of the Domestic Violence Protection Act (DVPA or Act).

### A.    DVPA

The DVPA, codified at § 6200 et seq., exists for the "purpose of . . . prevent[ing] acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence."  (§ 6220.)  Included within the Act's definition of "domestic violence" is "abuse perpetrated against . . . [a] . . . former spouse."  (§ 6211,

9

subd. (a).)  And included within the Act's definition of "abuse" is "disturbing the peace of the other party." (§§ 6203, subd. (a)(4), 6320, subd. (a).)

As contemplated within the Act, " 'disturbing the peace of the other party' refers to conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party," either "directly or indirectly, including through the use of a third party, and by any method or through any means."[6]  (§ 6320, subd. (c).)  In examining the totality of the circumstances and determining whether a party has engaged in conduct that destroys the mental or emotional calm of the other party, courts apply a subjective standard rather than an objective—i.e., "reasonable person"— standard.  (*Parris J. v. Christopher U.* (2023) 96 Cal.App.5th 108, 121 (*Parris J.*).)

To advance its purpose of preventing acts that disturb the peace of a former spouse, the Act authorizes a court to issue a restraining order (i.e., a DVRO) "if an affidavit or testimony . . . shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse" (§ 6300, subd. (a); see also *Br. C. v. Be. C.* (2024) 101 Cal.App.5th 259, 269 [burden of proof is preponderance of the evidence])—including, as just discussed, a past act or acts that destroy the former spouse's mental or emotional calm."  (§ 6320, subd. (c).)

---

6    Such conduct "includes, but is not limited to, coercive control, which is a pattern of behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty.  Examples of coercive control include, but are not limited to, unreasonably . . . [i]solating the other party from friends, relatives, or other sources of support . . . [and] [c]ontrolling, regulating, or monitoring the other party's movements, communications, daily behavior, finances, economic resources, or access to services."  (§ 6320, subd. (c)(1) and (3).)

The Act further specifies that a DVRO may issue "based solely on the affidavit or testimony of the person requesting" such an order. (§ 6300, subd. (a); see also *In re Marriage of F.M. and M.M.* (2021) 65 Cal.App.5th 106, 119 [noting that "[i]n many domestic violence cases, . . . the sole evidence of abuse will be the survivor's own testimony which, standing alone, can be sufficient to establish a fact"].) In addition, the Act states that "[t]he length of time since the most recent act of abuse is not, by itself, determinative." (§ 6301, subd. (d).) Instead, " '[t]he court shall consider the totality of the circumstances in determining whether to grant or deny a petition for relief.' " (*In re Marriage of F.M.,* at p. 117–118.)

As can be seen from the discussion above, a court considering an application for a DVRO must look to "the totality of the circumstances" in determining whether a party has engaged in "conduct that . . . destroys the mental or emotional calm of the other party" (§ 6320, subd. (c)) and "in determining whether to grant or deny" a DVRO. (§ 6301, subd. (d).)

## B.    DVPA Proceedings

The DVPA proceedings in this case commenced in November 2019, when Christine filed a request for a DVRO. Not long after, the court issued a domestic violence temporary restraining order (TRO). But, within a matter of days, Christine joined with Nick in stipulating to dismissal of the 2019 TRO without prejudice; and the court dismissed that TRO accordingly.

Then roughly two and a half years later, in June 2022, Christine again filed a request for a DVRO. The same day she filed this request, the court granted a TRO requiring Nick to stay at least 100 yards away from Christine, from the minor children, and from the minor children's schools. Beginning in July 2022 and ending in June 2023, the 2022 TRO was amended seven times for various reasons, including to increase the stay-away distance to at least 300 yards, to make accommodations relating to the children, and to address

11

matters relating to Nick's possession of firearms. During and beyond this same period of time (beginning in January 2023 and ending in October 2023), the court presided over an 11-day evidentiary hearing regarding the application for a DVRO.

### 1. *Evidence*

Over the course of the evidentiary hearing, the court heard and saw evidence pertaining to numerous incidents and activities during and after the marriage that Christine said amounted to domestic violence and that Nick said were misconstrued or never happened.

By way of example, the court received evidence pertaining to allegations that, during the marriage, Nick had physically, emotionally, and verbally abused Christine, and psychologically manipulated and controlled her. The evidence of non-physical abuse during the marriage included testimony from Christine illustrating instances in which she contended that Nick had comported himself abusively toward her, "more times than I can even count," by degrading and humiliating her—in private, in front of the children, and in the company of family and friends—to the point that she was "made to feel like I'm nothing."

According to Christine, some of the non-physical abuse Nick directed at her during the marriage took on a religious aspect. Thus she testified: that Nick "started to believe that he was more akin to a prophet than a devout Catholic, even going so far as to claim that he was the son of Saint Therese of Lisieux;" that he "began using religion to justify abusing me emotionally, psychologically, and verbally; that he engaged in "cult-like behavior . . . to control and warp [her] realit[y];" and that, as the marriage wore on, he "became increasingly more fanatic, controlling, isolating, manipulative, and abusive."

12

Also according to Christine, other aspects of the non-physical abuse Nick directed at her during the marriage bordered on violence. Thus, for example, she testified that Nick "had fits of rage," that he "yelled and screamed in [her] face numerous times," that he often "got into [her] face to the point where [their] noses almost touched," and that he "gets so enraged, he shakes."

Asked to elaborate on some of the behavior described above, Christine further testified as follows:

"Q. During the marriage when he got so close to
you, . . . nose to nose, did he ever spit on you?

"A. Yes.

"[¶ . . . ¶]

"Q. During the marriage, when Mr. Vena got in your face,
do you recall what it was regarding?

"A. Many, many issues. Any—anything. It could be over
our children. It could be over our finances. It could be over
how long I was gone. Our spirituality. Anything. Sex.
Almost every facet of our lives. It just depended on where
he was at that day in his head.

"Q. During the marriage, did Mr. Vena ever talk down to
you?

"A. Yes.

"[¶ . . . ¶]

"Q. Can you give me an example of how he would have
talked down to you?

"A. Well, not only did he call me various names, like cunt
or, you know, bitch or FU, it was mostly about shaming me.

"[¶ . . . ¶]

"A: It was mostly about him shaming me and making me
just feel like I was nothing, like I wasn't a good mother, my

13

spiritual life wasn't as good as his. You know, financially, like, he would say things like 'You're never going to get it. You're never going to understand. You know, you just can't get it through your head what I'm saying to you.' "

Christine also testified about several specific incidents, two of which we will recount here. The first transpired during 2017 in a hotel room in Santa Barbara. According to Christine:

> "Mr. Vena started yelling at me in the room in front of the children. [One of the children] had tried to get him to stop. He was blaming me that he was drunk. It was my fault. Yelling and screaming, rage, shaking.
>
> "[¶ . . . ¶]
>
> "He was telling me that it was my fault that he was drunk. He was telling me to shut up, to be quiet. I felt like he could hit me. He was in my face. And I was trying to calm him because all the children were there. [One of the children] was trying to tell him that I didn't do anything, to leave me alone."

The second incident occurred during 2019 at the parties' home. According to Christine, Nick "flew into a rage" when she told him she would be unable to homeschool the children.

> "He came into the room where I was nursing the twins. I began to tell him that I was overwhelmed, and he began to yell at me and scream. He told me that I was a derelict in my duties, how dare I tell him that I couldn't do this, that he was going to have to take everything off of my plate, he was going to now take away all responsibilities that I had in the home because obviously I couldn't carry them out.
>
> "[¶ . . . ¶]
>
> "[Then he] insist[ed] that I need[ed] to check myself into a mental institution because I was such a failure as a mom."

The court also received evidence pertaining to Nick's behavior after the parties had separated and the marriage had been dissolved. This included,

14

for example, evidence that during this period of time Nick: had continued to manipulate, control, and otherwise abuse Christine; had attempted to intimidate a witness (one of the parties' children); had used a drone to surveil Christine while she was driving in her car; had sent Christine harassing messages through the Our Family Wizard (OFW) messaging application and through e-mails and texts; had moved to a home just 20 houses away from Christine's home; and had violated one or more of the 2022 TROs by, for example, repeatedly failing to stay at least 100 yards away from Christine.

In addition, the court received evidence pertaining to allegations that Nick was unstable or had a mental disorder, had used litigation as a vehicle through which to abuse Christine, had used money to exercise control over Christine, and had attempted to estrange the children from Christine.

As a result of Nick's conduct (including the behaviors described above), Christine testified, "be[ing] anywhere around [Nick] . . . gives me a high level of anxiety and fear."

### 2. *Issuance of the DVRO, and the Court's Remarks from the Bench*

On the hearing's eleventh day, the court heard closing arguments. Then it remarked from the bench on the evidence the parties had adduced during the preceding 10 days of testimony, and it proceeded to issue a DVRO requiring Nick to stay at least 100 yards away from Christine.

In its post-hearing remarks from the bench, the court said: "If I'm to find that there's domestic violence, it has to be under 6320(b), disturbing the

15

peace of the other."[7]  In addition, the court said that, in making its determination, it would look at "the totality of the circumstances."

The court also stated, with regard to some of the circumstances that had been alleged as grounds for a DVRO, that Christine had not met her burden of proof.  Thus, for example, it said: "I don't find that [Christine has] carried her burden of proof as to physical violence."  Similarly, regarding the drone, the court said: "I can't find 51 percent."  Likewise, with respect to witness intimidation, the court acknowledged that Nick had been "very forceful" and "very aggressive" in his communications with the child he had been accused of intimidating, but added: "I don't think he said anything that didn't come from a position of wanting [the child] to tell the truth.  And I don't think that that rises to the level of witness intimidation.  [¶]  [He]'s [the child's] father, he's got a right to communicate with [his child] and call [the child] out on something that he thinks is not the truth."  With respect to the assertion that Nick had used litigation as a vehicle with which to abuse Christine, the court disagreed.  And, as to the claim that Nick had a mental disability or disorder, the court said: "I don't find that that's the case."

As to some of the *other* circumstances that had been alleged as grounds for a DVRO, the court found that Christine *had* met her burden of proof and that such matters should be included in its consideration of the totality of the circumstances bearing on Christine's request for a DVRO.  Among such

---

7    The court presumably meant section 6320's subdivision (a) or (c), as it is in these subdivisions that the DVPA brings "disturbing the peace of the other party" within the definition of domestic violence (see §§ 6320, subd. (a), 6203, subd. (a)(4), 6211) and defines what that term means.  (See § 6320, subd. (c)).  Subdivision (b), by contrast, pertains to the inclusion in a DVRO of certain provisions relating to children and animals.

circumstances were those pertaining to the evidence (discussed *ante*) that, during the marriage, Nick had verbally and emotionally abused Christine and psychologically manipulated and controlled her. Also among such circumstances were those pertaining to what the court described as testimony that Nick had sent Christine electronic messages that she perceived as threatening, had violated one or more of the 2022 TROs by failing to stay the requisite distance away from Christine, had used money to exercise control over Christine, had moved to within 20 homes of Christine's home and had attempted to estrange the children from Christine.

In addition, the court made clear that it was according less weight to some of these circumstances than to others. Thus, for example, with respect to the allegation that Nick had used money to exercise control over Christine, the court said: "Certainly that's an issue, but that's an issue in nearly every . . . family law case where people have . . . or had assets. And I don't find that it's a significant factor here." In similar fashion, the court acknowledged the existence of countervailing circumstances that would reduce the weight to be accorded to Nick having chosen to move to a home near Christine's home. In this regard the court pointed out that Nick's decision "certainly show[ed] that there's no concern for how [she] feels by having him in such close proximity." But it noted that that decision had been motivated at least in part by a "father's desire to be close to his children" and that it might well have had the effect of furthering the children's best interests.

Of all the circumstances that the court indicated it would consider in determining whether to issue a DVRO, the circumstances on which it focused the most attention in its post-hearing remarks were those associated with the allegations that Nick had verbally and emotionally abused Christine, and

17

psychologically manipulated and controlled her, during the marriage. In fact, whereas the court mentioned each of the other circumstances discussed above only once during those remarks, it returned three separate times to the interrelated topics of verbal and emotional abuse and psychological manipulation and control.

Specifically, near the beginning of its remarks, the court said: "She's testified that there were 17 years of emotional and verbal abuse. She's given specific examples. And I heard her testimony, she was quite emotional. I didn't detect at any point that she was untruthful in her emotions. And I think that there were instances of emotional and verbal abuse over the 17 years." Thereafter, in the middle of its remarks, the court returned to this topic and said: "The yelling, the being in her face, demeaning her, calling her names. I think that that happened. I think that Mr. Vena did do those things." Then finally, toward the conclusion of its remarks, the court returned once more to this topic, saying: "Based on my review of the evidence, I think that Ms. Vena has proven, by a preponderance of the evidence, that there's been psychological control. I think there's been manipulation . . . by Mr. Vena . . . . There have been numerous instances of yelling in her face, demeaning her, calling her names."

## C. Analysis

On appeal, Nick acknowledges that the Family Code authorizes the issuance of a DVRO for "disturbing the peace of the other party" and that this phrase—disturbing the peace of the other party—refers to "conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party." But he contends that the court erroneously and prejudicially considered some circumstances it should not have considered, and failed to consider other circumstances that it *should* have considered, in determining that his conduct had destroyed Christine's mental or emotional

18

calm. In support of this contention, Nick points to six discrete aspects of the court's post-hearing remarks and argues that each of these aspects reveals error.

      1.     ***Evidence of Verbal Abuse, Emotional Abuse, and Psychological Manipulation and Control, During the Marriage***

We discuss below each of the six points of error that Nick asserts. But, before engaging in that discussion, we offer as context for that discussion two observations about Christine's testimony pertaining to the allegations that Nick verbally and emotionally abused her, and psychologically manipulated and controlled her, during the marriage. The first observation is that this evidence, considered in a vacuum, constitutes substantial evidence of conduct that destroys the mental or emotional calm of the other party within the meaning of the DVPA. The second observation is that it is evident from the court's emphasis on this evidence in its post-hearing remarks that this is the evidence to which the court accorded the most weight in determining, based on the totality of the circumstances, that Nick had engaged in conduct that destroyed Christine's mental or emotional calm (see § 6320, subd. (c)) and that a DVRO should issue. (See § 6301, subd. (d).)

Thus, as we consider the six points of error assigned by Nick, our focus is on whether any of these points reveal circumstances that the court either erroneously included or erroneously failed to include in its consideration of the totality of the circumstances and, if so, whether "it is reasonably probable"—i.e., whether it is "more than an *abstract possibility*"—"that a result more favorable to [Nick] would have been reached in the absence of the error." (*Cassim, supra,* 33 Cal.4th at p. 800.)

### 2. *Six Points of Error Assigned by Nick*

#### a. **Court's Post-hearing Remarks on "Manipulation by Both Parties"**

Nick's first assignment of error with respect to the DVRO pertains to a passage (quoted in part *ante*) in which the court said:

> "Based on my review of the evidence, I think that Ms. Vena has proven, by a preponderance of the evidence, that there's been psychological control. I think there's been manipulation by both parties—but manipulation by Mr. Vena—which is the issue today. There have been numerous instances of yelling in her face, demeaning her, calling her names. And the other incidences that I had noted, that I think do rise to the level of—under the totality of the circumstances—have destroyed the mental or emotional calm of the other party."

Zeroing in on the second sentence of this passage, Nick contends it reveals the court could not have considered *all* matters comprising "the totality of the circumstances" because, in that sentence, the court acknowledged that it was *ex*cluding from consideration circumstances pertaining to instances in which *Christine* had manipulated *Nick*.

Considering this sentence in context, however, we do not construe it as expansively as Nick does. In our view, the court's statement in this sentence is simply an acknowledgment that the DVRO that was being requested was to protect Christine from behavior (including manipulation) by Nick, rather than to protect Nick from behavior by Christine. Though the court could *conceivably* have intended the meaning that Nick ascribes to this sentence, that possibility does not help Nick because it merely introduces a potential ambiguity in the court's remarks, and that ambiguity must be resolved against him. (*In re Eli B.* (2022) 73 Cal.App.5th 1061, 1069 [" '[a] ruling by a trial court is presumed correct, and ambiguities are resolved in favor of affirmance' "]; *Doe v. Superior Court* (2021) 71 Cal.App.5th 227, 235 [a

20

reviewing court's task "is to review the propriety of the trial court's ruling and not its rationale"; . . . "an ambiguous or uncertain order should be construed in favor of its validity if possible"].)  For these reasons, we find no error in the court's post-hearing remarks regarding "manipulation by both parties."

### b.    Court's Post-hearing Remarks about Testimony of Sergeant Collis

Nick's second assignment of error with respect to the DVRO pertains to a passage in which the court commented on testimony by a sheriff's sergeant regarding the sergeant's contacts with the parties on two different days, two days apart, in 2022.

With regard to the first of the two days, Sergeant Jeremy Collis testified that, on that day, both parties telephoned him about one of their children who at the time was in Christine's custody, that Nick asked the sergeant to go "see the child firsthand to make sure the child was safe," that, based on his telephone conversations with Christine and Nick, the sergeant concluded the child was not in danger, and that he thus declined Nick's request and instead told Christine and Nick that they "need[ed] to work through [their] attorneys and the court in order to solve this problem."

With regard to the second of the two days, Sergeant Collis testified that, two days after the contacts described *ante*, he again engaged with Christine and Nick, that this time it was in the context of Nick "refusing to exchange the child," that when he (Sergeant Collis) arrived at Nick's home, Nick emerged from the home and relinquished the child to Christine, and that he (Nick) then "turned to [the sergeant] angrily and said, 'See what you did.' "

In its post-hearing remarks, the court said:

21

"I found something when I was reviewing my notes that showed me something about Mr. Vena that I think justifies my reliance on the testimony about him becoming angry, yelling in [Ms. Vena's] face, demeaning her and calling her names.

"When [Sergeant] Collis testified, he said that on the [day of the second] incident Mr. Vena became angry with [him], and said, 'see what you did,' blaming him in some way for the incident with [the child]. That shows, at least to my mind, a way to deflect blame from himself, his family, and his ex-wife to deal with their issues and try to blame this person, who is there just to keep the peace."

Citing these remarks, Nick contends that "[t]he finding by the court that Nick yelled at Christine, got in her face, demeaned her or called her names during the marriage based on the testimony of Sergeant Collis exceeds the bounds of reason."

We agree with Nick that, if the court had in fact premised those findings only on the testimony of Sergeant Collis, it would be error. But, as can be seen from the testimony noted *ante*, there is substantial other evidence to support these findings.

More importantly, we do not interpret the court's remarks about the sergeant's testimony in the same manner as Nick does. In our view, the court was not saying that the angry outburst at Sergeant Collis proved that Nick had treated Christine abusively during the marriage. Instead it was saying that the churlish comment Nick had directed at the sergeant was similar to the accusations he had leveled at Christine during the marriage, in the sense that both types of behavior had involved Nick becoming angry, deflecting blame from himself, and lashing out at another person for something that was not that person's fault. In this sense, the sergeant's testimony corroborated and thus reinforced Christine's testimony about some of the

behavior to which Nick had subjected *her*. Hence we perceive no error in the court's post-hearing remarks about the testimony of Sergeant Collis.

### c. Court's Post-hearing Remarks about Christine's Perceptions that Nick Alienated the Children and Sent Her Threatening Messages

Nick's third and fourth assignments of error with respect to the DVRO pertain to two passages in which the court indicated it would consider, in the totality of the circumstances, matters that Nick contends it should not have considered.

Specifically, in a passage corresponding to assignment of error number three, the court commented on two of the children having run away from and/or refused to return to Christine's care and on testimony of Christine asserting that this was a result of efforts by Nick "to ostracize them from their mother." And in a passage corresponding to assignment of error number four, the court commented on what it described as Christine's perception that OFW messages she had received from Nick were threatening. In these passages, the court said that Christine's perceptions or concerns that Nick was attempting to alienate the children or that his messages were threatening[8] were unreasonable. But it nonetheless said that it would

---

[8] The court referred to OFW messages that it said Christine perceived as threatening; however, it did not refer with specificity to any such messages, and we have found no testimony in which Christine described an OFW message (as opposed to some other kind of message) as threatening. We *have* seen testimony about an *e-mail* from Nick, to which Christine referred as follows in one of her declarations:

23

consider those concerns in the totality of the circumstances bearing on Christine's request for a DVRO.

Nick acknowledges the conclusion in *Parris J., supra,* 96 Cal.App.5th 108 that, in examining the totality of the circumstances and determining whether a party has engaged in conduct that destroys the mental or emotional calm of the other party, courts apply a subjective standard rather than an objective—i.e., "reasonable person"—standard. (See *ante.*) So doing, he concedes "the court was correct that, under *Parris J.,* it did not have to

> "[Nick] has now become truly unhinged and I am terrified of what he will do next. On June 23, 2022, after [his] request for more parenting time was denied, [Nick] sent me an email stating that he will not abide by Court Orders he does not believe are based on his perception of the truth . . . [He] also stated that he believes he needs to deliver our children some perceived religious justice and will stop at nothing to do so. I no longer believe [he] is mentally stable and fear for the safety of myself and our children. When I have seen [him] at exchanges, he appears unhinged, tense, and filled with anger and rage. The way he stares at our children and myself feels almost bone-chilling and scares me. I believe [he] has lost all concept of reality believing he is not obligated to abide by Court orders and that he alone can deliver some type of divine justice to our children. His escalating behavior . . . and his altered perception of reality driven by some perceived religious justice and deliverance makes [Nick] a danger to myself, our children, and others as he is behaving increasingly more fanatic and losing all concept of reality."

We also have seen a passage in which Nick's counsel argues that Christine "says she's been terrorized by [OFW] and text messages." Although it appears that counsel and the court may have inadvertently referred to OFWs when they intended to refer to e-mails or texts, we find any such discrepancy to be immaterial inasmuch as the thrust of the court's comments pertained to Christine's perception of threats in messages, and the type of message (OFW versus e-mail versus text) does not appear to have been material.

24

find [Christine's] concerns 'reasonable' to consider them in the totality of the circumstances." But he argues the court nonetheless should have excluded those perceptions or concerns from its consideration because it had made no finding that Nick actually attempted to alienate the children or that he actually threatened Christine using OFW.

In making this argument Nick in essence focuses on and amplifies the word "conduct," and plays down the words that follow it in the statement (at section 6320, subd. (c)) that " 'disturbing the peace of the other party' refers to conduct *that, based on the totality of the circumstances, destroys the mental or emotional calm* of the other party" (italics added). The court's comments to the effect that Christine's concerns relating to alienation of the children and to threatening messages warranted consideration despite being unreasonable bore, not on Nick's conduct, but rather on the totality of the circumstances— i.e., the prism—through which his conduct was to be viewed.

This prism is one that includes the sensibilities—whether reasonable or not—of the individual seeking relief; and, in the present case, it is one that is characterized by an unusually heightened level of sensitivity by the plaintiff (Christine) to conduct by the defendant (Nick). As we have said (see *ante*), Nick's conduct in the form of past acts of verbal and emotional abuse and psychological manipulation and control, is conduct enough on which to find abuse of the sort that warrants issuance of a DVRO. The unusually heightened sensitivity on the part of Christine, which is a part of the totality of the circumstances through which such conduct is to be viewed, reveals that Christine's mental or emotional calm is all the more prone to being destroyed by such conduct, and thus that a DVRO is all the more warranted.

For these reasons, we find no error in the court's post-hearing remarks about Christine's perceptions that Nick alienated the children and used OFW to make threats.

### d. Court's Remarks Regarding TRO Compliance in Relation to an Encounter at a Soccer Field

Nick's fifth assignment of error with respect to the DVRO pertains to a passage in which the court commented about an occasion on which it appears Nick was present within the 300-yard stay-away perimeter mandated by the amended TRO that was in effect at the time. The location where this incident occurred was a soccer field where one of the minor children was present either to play soccer or to pose for team photographs. Although the record is somewhat unclear, it appears that on the occasion in question the child was in Nick's (rather than Christine's) custody, Nick was not expecting Christine to be present, and he departed the area not long after noticing that she *was* present.

Noting that on a previous occasion Nick had requested and received leave of court to attend a school function that the TRO then in effect would otherwise have forbidden him from attending, the court remarked that Nick could have sought a similar "carve out" to permit him to be at the soccer event, and that the fact that he had not requested such leave to be at the soccer field was a circumstance the court could consider. But, as Nick points out, it was *he (Nick)*—not Christine—who had custody of the child at the soccer field. This being the case, we conclude it was error for the court to include this incident in its consideration of the totality of the circumstances.

### e. Court's Silence Regarding Testimony of Dr. Sparta

Nick's sixth and final assignment of error pertains to a question and answer from the deposition testimony of expert witness Dr. Stephen Sparta.

26

Dr. Sparta did not testify at trial. But the court admitted in evidence a page from Dr. Sparta's deposition, in which Dr. Sparta testified as follows:

> "Q. You've testified that the mother inaccurately perceives the father in terms of domestic violence, correct?
>
> "A. Generally speaking, Yes."

The court did not mention this testimony in its post-hearing remarks.

Purporting to paraphrase this testimony, Nick contends that Dr. Sparta testified to the effect that "virtually anything Nick does is viewed as domestic violence by Christine." In addition, Nick interprets the court's post-hearing silence regarding this testimony as proof that the court did not include the testimony in its consideration of the totality of the circumstances and that this was error because "uncontradicted expert testimony on a matter solely within the knowledge of experts is conclusive and cannot be disregarded."

But this analysis is faulty at each step. First, Dr. Sparta's testimony in the snippet of testimony that was admitted in evidence is not as expansive as Nick's paraphrase suggests, and the absence of context renders it difficult to evaluate. Second, the fact that the court did not mention the testimony in its post-hearing remarks does not mean the court did not consider it. And third, neither the existence of abuse (be it physical, verbal, or emotional), nor perceptions regarding the existence or absence of abuse, are matters solely within the knowledge of experts. Hence we perceive no error in the fact that the court did not mention Dr. Sparta's testimony in its post-hearing remarks.

### 3. *Prejudice*

As discussed *ante*, of the six points Nick has raised in his challenge to the DVRO, we have discerned error in one: the court's inclusion of the soccer field encounter in its consideration of the totality of the circumstances surrounding Nick's conduct. Thus we consider whether "it is reasonably

27

probable"—i.e., whether it is "more than an abstract possibility"—"that a result more favorable to [Nick] would have been reached" had the court excluded this encounter from its consideration. (See *Cassim, supra,* 33 Cal.4th at p. 800; see also *Sabato, supra,* 242 Cal.App.4th at pp. 724–725.)

Our review of the record indicates that one set of circumstances in particular played an outsized role in the court's determination that Nick had engaged in conduct destructive to Christine's mental or emotional calm and that a DVRO should issue: the verbal and emotional abuse, and psychological manipulation and control, to which the court found Nick had subjected Christine during the marriage. Had the court's post-hearing remarks indicated that the encounter at the soccer field played a prominent role in its deliberations or that the court's decision to issue a DVRO might have been "a close call," then we might discern more than an abstract possibility that exclusion of this encounter from those deliberations would have yielded a result more favorable to Nick. And in that case, the error might require reversal.

But, in light of the emphasis the court placed on the evidence pertaining to verbal and emotional abuse and psychological manipulation and control, we perceive no such prominent role for the soccer field encounter and no close call. As a consequence, we conclude there is no "reasonable probability" (see *Cassim, supra,* 33 Cal.4th at p. 800; *Sabato, supra,* 242 Cal.App.4th at pp. 724–725) that the court would have reached a result more favorable to Nick had it excluded the soccer field encounter from its consideration. Thus the error in considering that encounter was harmless.

28

## IV.
## **DISPOSITION**[9]

The child support order is reversed to the extent its determination of the arrearage for the 16-month period comprising January 1, 2022, through April 30, 2023, is premised on the computational error discussed *ante*. On remand, the court shall recompute child support for that period using an income figure of $27,794 per month for Nick. In all other respects the child support order and DVRO are affirmed. Christine is entitled to costs on appeal.

KELETY, J.

WE CONCUR:

O'ROURKE, Acting P. J.

DATO, J.

---

9    We grant Nick's request for judicial notice of certain mathematical facts, propositions, and equations. (Cf. *People v. Bradley* (1982) 132 Cal.App.3d 737,743, fn. 6 [taking judicial notice of "mathematical truth" of an equation].) We disregard his reply appendix, because it submitted evidence subsequent to the filing of the respondent's brief and without leave of court.